Darnell HUNTER, Plaintiff-Appellee,
Cross-Appellant,

v.

REARDON SMITH LINES, LTD., a for-
eign corporation, Defendant-Appellant,
Cross-Appellee.

No. 81–6143.

United States Court of Appeals,
Eleventh Circuit.

Nov. 14, 1983.

Brendan P. O'Sullivan, Fowler, White,
Gillen, Boggs, Villareal & Banker, P.A.,
Tampa, Fla., for defendant-appellant, cross-
appellee.

Joel D. Eaton, Podhurst, Orseck, Parks,
Josefsberg, Eaton, Meadow & Olin, Joel S.
Perwin, Miami, Fla., for plaintiff-appellee,
cross-appellant.

Before TJOFLAT, FAY and ANDER-
SON, Circuit Judges.

R. LANIER ANDERSON, III, Circuit
Judge:

Darnell Hunter, a longshoreman, was in-
jured while working aboard the motor ves-
sel FRESNO CITY in Tampa, Florida.
Hunter brought this action for negligence
against the shipowner, Reardon Smith
Lines. The District Court for the Middle
District of Florida entered judgment on a
jury verdict for $157,800 in Hunter's favor.
Reardon Smith appeals, contending *inter
alia* that the district court's instructions to
the jury did not adequately set out the
governing law as interpreted by the United
States Supreme Court in *Scindia Steam
Navigation Co. v. Santos,* 451 U.S. 156, 101
S.Ct. 1614, 68 L.Ed.2d 1 (1981). We agree,
and thus we reverse and remand for a new
trial. In addition, we grant Hunter's cross-
appeal and order that the effect of future
inflation should be considered in calculating
any award for future damages Hunter re-
ceives on remand.

# I. FACTUAL SUMMARY

On July 26, 1978, Hunter was employed as a longshoreman by the Tampa Stevedoring Co. ("the stevedore") and was assigned to a gang of approximately 14 men who were loading bags of phosphate into hold number three on the FRESNO CITY. The bags of phosphate weighed approximately 110 pounds each and previously had been loaded on pallets by the stevedore. Several members of Hunter's gang were on the dock attaching spreader bars to the pallets. One gang member was operating the ship's number three crane, and another member of the gang was on the deck giving signals to the crane operator. The remainder of the gang members, including Hunter, were in hold number three, unloading bags off the pallets and stowing them in the hold.

Longshoremen were working in all five of the FRESNO CITY's holds on July 26, and work began at approximately 8:00 a.m. Within a few minutes, however, the crane which was carrying pallets to the number three hold was taken out of service, apparently because it was leaking oil or hydraulic fluid.[1] The ship's engineers worked on the crane for almost two hours, and the crane was put back into operation sometime between 10:00 and 10:30 a.m. There was conflicting testimony regarding whether the crane was functioning properly after it began operating again.[2]

Hunter's accident occurred less than an hour after the crane was put back into operation. Hunter and three other longshoremen were building a runway in the hatch area when two bags fell off a pallet above them. One of the bags landed on the deck, but the other bag fell into the hold and hit Hunter on the back.[3] One of the men working with Hunter testified that the bags fell because the crane stopped suddenly and jarred the bags off the pallet. Another man working in the hold testified that the crane "cut off" and dropped the pallet slightly, causing the pallet to hit the edge of the hatch opening and thus knocking the bags loose. Other witnesses testified that the crane did not stop suddenly and that the pallet did not hit anything, and some of the witnesses contended that the bags of phosphate simply were slippery and often fell off without explanation.

Although Hunter was knocked down and momentarily stunned by the blow from the bag, in a few minutes he was able to slowly climb a ladder out of the hold[4] and was taken to a hospital. The rest of the longshoremen in hold number three continued the loading operation, using the same crane which allegedly had caused Hunter's injury. The ship's engineers did shut down the crane at 11:50 a.m., apparently to make some repairs or to perform some maintenance,[5] but the crane was back in operation at 1:00 p.m. when the longshoremen returned from lunch and was used without

---

1. One witness testified that the crane was "pouring oil," Record on Appeal ("ROA"), vol. 6, at 68. The ship's chief officer testified that the crane lost 20 gallons of hydraulic fluid in 10 minutes. Deposition of Chief Officer Robert E. Baker at 60.

2. Hunter's witnesses, all longshoremen who were down in the hold, testified that during this time the crane was "dragging," "smoking bad," "leaking oil," and making a "whining noise," and that the crane was just "barely coming over to the top, and then a lot of time it would stop in the middle of the air and swing." ROA, vol. 6, at 29, 30, 48, 70. In contrast, Reardon Smith's witnesses, the ship's captain, the chief officer and several longshoremen, including the crane operator and the safety man, testified either that the crane was operating properly or simply that they could not remember any prob-

lems with the crane after it was put back into operation.

3. Some witnesses testified that Hunter was in the hatch opening, and Reardon Smith contended that this constituted contributory negligence. Other witnesses indicated that Hunter was in the wings rather than in the hatch opening and that the bag hit the corner of the hatch and ricocheted into the wings. The jury found that Hunter was not contributorily negligent.

4. The longshoremen on the deck had lowered a stretcher for him, but Hunter decided to climb a ladder to get out of the hold.

5. The ship's engineers did not testify at trial. Thus, it is not entirely clear why the crane was shut down just 10 minutes before the lunch break, nor is it clear what repairs, if any, were undertaken at this time.

incident for the rest of that day[6] and the two days which followed.

Hunter spent two days in the hospital in traction. Subsequently, he was treated by several physicians for a variety of problems which he attributed to his injury. The jury awarded Hunter $7,800 for "past damages" (lost wages, medical bills, pain and suffering), $50,000 for future pain and suffering, and $100,000 for loss of future wages.

## II. THE JURY INSTRUCTIONS

■ Reardon Smith's primary contention[7] on appeal is that the district court did not adequately instruct the jury on the law which governs a shipowner's duty to longshoremen working on board a vessel. Both parties agree that the jury should have been instructed in accord with the rules established by the Supreme Court in *Scindia Steam Navigation Co. v. Santos, supra,* and we begin our analysis of this issue with a brief review of the *Scindia* decision.

The facts in *Scindia* were similar to the facts in this case. A longshoreman was injured when he was struck by a sack of wheat that had fallen from a pallet being held in suspension by one of the ship's winches, which was being operated by another longshoreman. The evidence established that the braking mechanism which slowed the winch's descent had been malfunctioning for several days, but it was not clear whether the sacks which hit the longshoreman had fallen because the braking mechanism slipped or because the suspended pallet was swinging back and forth.

The district court had granted summary judgment for the shipowner, reasoning that the shipowner was not liable for dangerous conditions created by the stevedore, the longshoreman's employer, while the stevedore was in exclusive control of the loading operation. The Court of Appeals for the Ninth Circuit had reversed, ruling that a shipowner had to exercise "reasonable care under the circumstances" and that there were factual questions about the shipowner's conduct which had to be resolved by a jury. The Supreme Court affirmed the Ninth Circuit's judgment, but set forth a somewhat different standard regarding the duty the shipowner has to longshoremen working on board a vessel.

The Supreme Court ruled that at the outset of cargo operations the shipowner's duty

> extends at least to exercising ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety to persons and property, and to warning the stevedore of any hazards on the ship or with respect to its equipment that are known to the vessel or should be known to it in the exercise of reasonable care, that would likely be encountered by the stevedore in the course of his cargo operations and that are not known by the stevedore and would not be obvious to or anticipated by him if reasonably competent in the performance of his work.

451 U.S. at 166–67, 101 S.Ct. at 1622. Once cargo operations have begun, however, the scope of the shipowner's duty usually is somewhat limited.[8] According to the Supreme Court:

> manifest weight of the evidence and excessive as a matter of law, is without merit. The remaining contentions relate to issues which may not arise again on remand; thus, we need not consider them.

**6.** Hunter points out that the crane was shut down at 3:30 p.m. on the day of the accident and argues that the early shutdown suggests that the crane was malfunctioning. The record indicates, however, that all of the ship's loading operations stopped at that time due to rain. Thus, the fact that the crane was shut down at 3:30 p.m. does not suggest that anything was wrong with the crane.

**7.** Reardon Smith raised a number of other contentions on appeal. The other major contention, that the jury's verdict was against the

**8.** Even though cargo operations have begun, the shipowner may be liable for injuries to longshoremen if the shipowner is "actively involve[d]" in the cargo operations or "fails to exercise due care to avoid exposing longshoremen to harm from hazards they may encounter in areas, or from equipment, under the active

[A]bsent contract provision, positive law, or custom to the contrary ... the shipowner has no general duty by way of supervision or inspection to exercise rea-' sonable care to discover dangerous conditions that develop within the confines of the cargo operations that are assigned to the stevedore. The necessary consequence is that the shipowner is not liable to the longshoremen for injuries caused by dangers unknown to the owner and about which he had no duty to inform himself.

*Id.* at 172, 101 S.Ct. at 1624. Nevertheless, addressing the situation where a shipowner learns that an apparently dangerous condition has developed during the cargo operations, the Supreme Court held that "there are circumstances in which the shipowner has a duty to act where the danger to longshoremen arises from the malfunctioning of the ship's gear being used in the cargo operations." *Id.* at 175, 101 S.Ct. at 1626. Thus, although the court noted that the determination of whether problems with the ship's gear pose an unreasonable risk of harm to the longshoremen is "a matter of judgment committed to the stevedore in the first instance," *id.,* the court held that if the shipowner is aware that the ship's gear is malfunctioning, that the stevedore is nonetheless continuing to use it, and that the stevedore's continued use of the gear is "obviously improvident," then the shipowner has a duty to intervene and repair the ship's gear. *Id.* at 175–76, 101 S.Ct. at 1626–27.

In this case, Hunter argued at least two theories of liability to. the jury.[9] First, Hunter argued that Reardon Smith's employees negligently turned over a malfunctioning crane to the stevedore, thus breaching the duty to have the ship and its equip-

ment in proper condition so that the stevedore could carry on cargo operations with reasonable safety. Second, Hunter argued in the alternative that a dangerous condition arose during the course of the cargo operations, that Reardon Smith's employees were aware of the dangerous condition,[10] and that Reardon Smith's employees failed to intervene even though they knew or should have known that the stevedore's continued use of the crane to load bags of phosphate created an unreasonable risk of harm to the longshoremen, thus breaching the shipowner's duty to act when the stevedore's actions are obviously improvident.

Although the district court properly instructed the jury regarding the shipowner's duty to have the ship and its gear in proper condition for the stevedore,[11] we conclude that the court did not adequately inform the jury about the limited nature of the shipowner's duty once the stevedore has commenced, and assumed primary responsibility for, the cargo operations. The only instructions the district court gave regarding the shipowner's duty after cargo operations have begun were as follows:

[O]nce the stevedore's cargo operations have begun, absent positive law or custom to the contrary, the shipowner has no general duty by way of supervision or inspection to exercise reasonable care to *discover* dangerous conditions that develop within the confines of the cargo operations that are assigned to the stevedore. Thus, the shipowner is not liable to the longshoremen for injuries caused by dangers *unknown* to the shipowner and about which he had no duty to inform himself.

Record on Appeal, vol. 11, at 484 (emphasis added). These instructions were in accord with *Scindia,* but they dealt only with Rear-

---

control of the vessel during the stevedoring operation." 451 U.S. at 167, 101 S.Ct. at 1622.

**9.** Hunter suggests a third theory on appeal— that Reardon Smith is liable because its employees negligently failed to repair the crane after voluntarily undertaking a duty to make repairs. We need not consider this theory or decide whether it was adequately submitted to the jury. *See* note 15 *infra.*

**10.** Hunter made a strong effort during the trial to convince the jury that the FRESNO CITY's officers were aware that the crane was malfunctioning after it was put back into operation.

**11.** The court's instructions on Hunter's first theory of liability were taken almost verbatim from the Supreme Court's *Scindia* decision.

don Smith's duty, and the limits thereon, with respect to *unknown* dangers. The instructions did not give the jury any guidance about the scope of the shipowner's duty when there is a problem with the ship's gear that is *known* to both the shipowner and the stevedore. Such guidance was necessary for the jury to properly consider Hunter's second theory of liability. In other words, there are two potential duties on the part of the shipowner once cargo operations have begun: the potential duty to *discover unknown* dangers, and the potential duty with respect to dangers which are *known* to the shipowner. The trial court here, in the instruction quoted above, properly charged the jury that the shipowner has no general duty to *discover unknown* dangers. However, the quoted instruction does not address the shipowner's second potential duty, *i.e.,* with respect to dangers which are *known* to the shipowner. With respect to this potential duty the Supreme Court in *Scindia* precisely defined the *very limited* duty of the shipowner:

> Yet it is quite possible, it seems to us, that ... [the stevedore's] judgment in this respect was so obviously improvident that ... [the shipowner], if it *knew* of the defect and that ... [the stevedore] was continuing to use it, should have realized the winch presented an unreasonable risk of harm to the longshoremen, and that in such circumstances it had a duty to intervene and repair the ship's winch.

451 U.S. at 175–76, 101 S.Ct. at 1626 (footnote omitted) (emphasis added). The Court also defined the primary responsibility of the stevedore:

> [W]hether it could be safely used or whether it posed an unreasonable risk of harm to ... [the longshoremen] was a matter of judgment committed to the stevedore in the first instance.

*Id.* at 175, 101 S.Ct. at 1626. The Supreme Court went on to rule:

> [T]he legal duties placed on the stevedore and the vessel's justifiable expectations that those duties will be performed are relevant in determining whether the shipowner has breached its duty. The trial court and where appropriate, the jury,

should thus be made aware of the scope of the stevedore's duty under the positive law.

*Id.* at 176, 101 S.Ct. at 1626.

Although the trial court here may have properly charged the jury as to the primary nature of the stevedore's responsibility during cargo operations with respect to the discovery of *unknown* dangers, it failed to instruct the jury that the stevedore retains the primary responsibility even with respect to dangers which are *known* to the shipowner. Reardon Smith requested, and was entitled to, such instructions. We thus conclude that the district court erred. The error is significant because the trial focussed on Reardon Smith's duty with respect to *known* dangers. The Supreme Court in *Scindia* expressly held that the jury should be made aware of the "duties placed on the stevedore and the vessel's justifiable expectations that those duties will be performed." *Id.* at 176, 101 S.Ct. at 1626.

The error was magnified by a paragraph early in the jury charge which suggested to the jury that the shipowner had a duty to supervise the cargo operations. The district court instructed the jury:

> In this case, the plaintiff claims that the defendant was negligent and that such negligence was a legal cause of damage sustained by the plaintiff. Specifically, the plaintiff alleges that the crane on the M/V FRESNO CITY was malfunctioning before the accident and that the defendant was negligent in failing to properly maintain and repair the ship's crane at hatch number three *or to properly supervise cargo operations.* In order to prevail on this claim, the plaintiff must prove by a preponderance of the evidence, one, that the defendant was negligent, and two, that such negligence was a legal cause of damage sustained by the plaintiff.

Record on Appeal, vol. 11, at 482–83 (emphasis added). We recognize that this instruction merely told the jury that "*the plaintiff alleges* ... that the defendant was negligent in failing ... to properly supervise cargo operations." *Id.* (emphasis add-

ed). However, the last sentence might have given the jury the impression that the plaintiff could prevail on his claims—including the "failure to supervise" claim—merely by proving negligence and proximate cause. Such an impression would have been reinforced by comments Hunter's counsel made during closing argument [12] which also suggested that Reardon Smith had a duty to supervise the cargo operations.[13]

We conclude, therefore, that the district court did not adequately instruct the jury on the law relevant to Hunter's second theory of liability. Further, although the court properly instructed on Hunter's first theory of liability, the jury returned only a general verdict and we are unable to determine from the record which theory the jury relied upon in reaching that verdict.[14] Accordingly, we reverse the judgment rendered below and remand for a new trial.[15]

### III. HUNTER'S CROSS–APPEAL

■ On cross-appeal, Hunter contends that the district court erred when it refused

**12.** For example, in response to Reardon Smith's argument that the crane was not malfunctioning and that the bags of phosphate fell off the pallet because the bags were covered with plastic and, therefore, were very slippery, Hunter's attorney argued that the ship's crew members had a duty to stop the cargo operations if they saw the stevedore loading slippery bags without taking proper safety precautions. *See, e.g.,* ROA, vol. II, at 433 ("[T]hen if you think that they were using an unsafe method of slippery bags and no safety slings, the mate—all the mates saw that and under the law did not do anything about it."); *id.* at 473 ("The chief mate did see bags—said he thought he saw some bags slip off on the dock and he didn't do anything about it like he was supposed to do."); *id.* at 473–74 ("But the guy I would like to hear is ... the third or second mate, ... to ask them a couple of questions: If you saw these dangerous slippery bags, why didn't you do something?").

**13.** Hunter suggests on appeal that a charge imposing a duty to supervise cargo operations on Reardon Smith is not error in any event because Reardon Smith did, by contract or course of dealing between the parties, undertake a duty of supervision. This argument cannot sustain the verdict because at the charge conference Hunter's counsel expressly agreed to delete any reference in the jury instructions to Reardon Smith's having undertaken *by contract* any duty to supervise. Record on appeal, vol. 10, at 367.

**14.** This case again illustrates the potential value of special verdicts. *See* Brown, *Federal Special Verdicts: The Doubt Eliminator,* 44 F.R.D. 338 (1968); *cf. Petes v. Hayes,* 664 F.2d 523 (5th Cir.1981).

**15.** Hunter argues that this court has discretion to affirm the jury's verdict because any error in the instructions on the second theory was harmless in view of the sufficiency of the evidence on the first theory of liability. We recognize that some courts have affirmed jury verdicts under similar circumstances. *See, e.g., Traver v. Meshriy,* 627 F.2d 934, 938 (9th Cir.

1980) ("Where more than one theory of recovery has been submitted to the jury in a civil case, and where on appeal it is claimed that as to one of the theories there was a lack of evidential support or an error of law in submitting the theory to the jury, the reviewing court has discretion to construe a general verdict so attributable to another theory if it was supported by substantial evidence and was submitted to the jury free from error."); *cf. American Airlines, Inc. v. United States,* 418 F.2d 180 (5th Cir.1969) (where trial court instructed jury that it could find for plaintiff if it found defendant negligent on any of 31 particulars, the fact that one particular was not supported by the record did not require reversal because it was "inconceivable that in the mass of testimony so clearly establishing negligence in thirty other particulars this issue could have influenced the verdict ...."). *But see, e.g., Mixon v. Atlantic Coast Line R.R.,* 370 F.2d 852, 860 (5th Cir. 1966) (Brown, J., specially concurring) ("Under the enigma wrapped in a mystery of the general charge and general verdict, we are required to assume that the jury followed only the erroneous instruction ...."). *Kicklighter v. Nails by Jannee, Inc.,* 616 F.2d 734, 742 (5th Cir. 1980) (Anderson, J.) (quoting Judge Brown's opinion in *Mixon;* however, the question whether an appellate court has discretion to affirm under such circumstances was not considered by the court). We acknowledge the force of Hunter's argument that an appellate court should have some discretion to treat as harmless or nonreversible an error in the instructions pertaining to one theory when there are accurate instructions with respect to other theories, but we need not address the argument or determine the scope of such discretion. Assuming *arguendo* we possess such discretion, we would not exercise it in this case. On the facts of this case, we conclude that there was a significant risk that the jury relied upon an erroneous assumption that Reardon Smith owed a duty to supervise cargo operations beyond the limited duty imposed by law. *Cf. Traver v. Meshriy,* 627 F.2d at 938–39 (outlining the factors which a court should consider in

to permit expert testimony or to instruct the jury regarding the effect of future inflation on the award for future damages. In ruling on this matter, the district court relied on *Johnson v. Penrod Drilling Co.,* 510 F.2d 234 (5th Cir.), *cert. denied,* 423 U.S. 839, 96 S.Ct. 68, 46 L.Ed.2d 58 (1975), which proscribed consideration of inflation in making awards for future damages. Developments since the trial of this case indicate that *Penrod* is no longer viable law. *See Culver v. Slater Boat Co.,* 688 F.2d 280 (5th Cir.1982) (en banc);[16] *see also Jones & Laughlin Steel Corp. v. Pfeifer,* —— U.S. ——, 103 S.Ct. 2541, 76 L.Ed.2d 768 (1983). Accordingly, if a new trial is necessary, the effect of future inflation on any award Hunter receives for future damages should be accounted for in an appropriate manner.

REVERSED and REMANDED.

deciding whether to exercise its discretion to affirm despite an error with respect to one theory of liability).

16. The mandate has not yet issued in *Culver v. Slater Boat Co.,* which expressly overrules *Penrod,* but *Culver* undoubtedly will govern if retrial is necessary.