**HARRINGTON AND COMPANY, a Florida corporation, and Insurance Company of North America, a Pennsylvania corporation, Plaintiffs,**

**v.**

**UNITED STATES LINES, INC., a Delaware corporation, Defendant.**

**No. 81–713–Civ–J–B.**

United States District Court,
M.D. Florida,
Jacksonville Division.

April 25, 1984.

---

17.  *See* note 16, *supra.*

James M. McLean, Jacksonville, Fla., for plaintiffs.

Gary A. Bubb, Jacksonville, Fla., for defendant.

## OPINION

SUSAN H. BLACK, District Judge.

The Court tried the above-styled case without a jury on January 17, 18, 19 and on February 2, 1984. The plaintiffs filed a third-party, negligence claim pursuant to §§ 905 and 933 of the Longshoremen's & Harbor Workers' Compensation Act (hereinafter "LHWCA"), 33 U.S.C. § 901, *et seq.*, for injuries resulting in the death of longshoreman Robert Sumpter. The Second Amended Complaint alleges that the defendant vessel owner breached its duty to the decedent to exercise reasonable care to protect the decedent against dangers resulting from the unsecured doors of a cargo container loaded aboard the defendant's vessel.

The Court, having considered the exhibits, the briefs of counsel, the testimony at trial, and having observed the demeanor of the witnesses, makes the following findings of fact and conclusions of law. The Court will first discuss the facts by category, beginning with a description of the vessel, the onloading and offloading stevedoring operations, the voyage, and concluding with the fatal accident of July 11, 1980. The second portion of the Court's opinion will set forth the conclusions of law, specifically as they relate to determining the scope of the duty owed by a vessel owner

to an offloading stevedore and its hired longshoremen.

## The Vessel

At all times relevant, the defendant United States Lines, Inc. (hereinafter "U.S. Lines") owned and operated the S.S. "American Legend," a general cargo vessel that had been converted to transport twenty and forty-foot cargo containers. These containers, discussed *infra*, are large rectangular boxes resembling the trailer compartments of tractor-trailer trucks seen daily in highway transportation. To accommodate the containers, the general hatch space of the "American Legend" is divided into "cells" by container guides which run vertically from the floor of the cargo hatch to the top of the hatch. (Plaintiffs' Exhibits 12C, D, G, & I). The guides are welded along the side of the hatch on metal plates creating a metal infrastructure within the hatch. (Plaintiffs' Exhibits 11A & 12B). The guides facilitate the loading and unloading process by acting as tracks to guide the placement and removal of containers. The container guides also prevent the containers from moving while in stow and keep them neatly stacked during the vessel's voyage.

Access to the cargo space of the "American Legend" is through various hatch openings located on the deck. As a precaution for the deck worker, the hatch openings are surrounded by a waist-high metal coaming. Hatch #3 of the "American Legend" is located in the forward part of the vessel and is divided into five container cells alligned single-file from port to starboard. The three middle cells can each store five containers, one stacked on top of the other. The two outer cells, located at the starboard and the port sides, can only store two containers each. These end cells are limited by the configuration of the vessel's outer shell which curves inwards at the ends towards the keel or center. Below each of these two cells is an empty space that stretches from the cell bottom to the floor of the ship hatch. Hatch #3 can accommodate a total of nineteen forty-foot containers.

As with all the hatches on the "American Legend," Hatch #3 has a steel access ladder welded to the side of the hatch. (Plaintiffs' Exhibits 8A & B). Hatch #3's access ladder, located in the vicinity of the port-side, aft section of the hatch (Plaintiffs' Exhibit 7), descends approximately twelve feet into the hatch coaming to a platform extending the entire beam of the vessel, port to starboard. Another section of the ladder, offset approximately two feet, continues the descent to another platform in the general cargo space of the hatch. This platform similarly provides access along the entire beam of the vessel. The third section of the access ladder, offset another two feet, descends to the hatch floor.

## Onloading Operation

On July 6, 7, and 8, 1980, the "American Legend" was docked at Staten Island, New York and loaded with empty forty-foot containers to be discharged at Jacksonville, Florida. The loading was done by longshoremen employed by Howland Hook Corp., the onloading stevedore. The stevedore is hired by the shipowner, in this case U.S. Lines, to load or unload the ship's cargo. The stevedore assumes control of the loading or unloading process and supervises the longshoremen that it hires to physically move the cargo. Although there was no testimony as to the actual loading operation as it occurred in this case, there was testimony as to the normal procedure followed, which the Court finds was followed in this case.

The longshoremen load the ship with the use of a gantry crane, to the end of which is a device referred to as a spreader bar. (Plaintiffs' Exhibits 3A–C & 6). The spreader bar which weighs approximately ten to fifteen tons is lifted over the container to be loaded then let down with enough force that its four arms automatically catch on the four ends of the container. The crane operator then lifts the container over to the ship, easing it down the hatch along the container guides discussed *supra*.

Prior to being loaded, the doors of cargo containers should be secured by latching. The container doors are at one end and open outward from the container. The doors are framed by a seal which assures an air-tight closure once they are latched. Two rods run from top to bottom along each door. (Plaintiffs' Exhibits 4B, C, & D). Each rod has a handle which, when turned, moves a hook-like device located at either end of the rod into a contoured receptacle, securing the door. After being turned into the locking position, the handles are further secured by sliding them into a receptacle and then closing the catch over the receptacle. (Plaintiffs' Exhibit 4A). The doors of a container must be closed before the container can be loaded; however, containers can be loaded with doors that are closed but not latched or secured. (Testimony of deBoer). Unsecured container doors are a common occurrence and, invariably, some containers are loaded with their doors unsecured. (Harrington was aware that containers were often loaded with their doors unsecured—Testimony of deBoer, McDowell, Brown, and Gavin).

## The Voyage

Although there was no testimony as to the actual transportation of these containers aboard the "American Legend," it was established that normally containers travel stacked one on top of the other within the container cells of the hold. (Plaintiffs' Exhibit 10). The containers are closely packed, and, though upon inspection some of the door latches could possibly be seen, most could not. Even if a door were viewed and determined to be unlatched, the arrangement of stacked containers would make securing that door while it was stacked impossible in many cases. Doors properly latched will not come open (Testimony of deBoer and Miley) during sea transit. In most cases, doors improperly latched remain closed during the sea voyage. They do not come open until the spreader bar is attached and the crane operator attempts to remove the container, as

discussed *infra*. (Testimony of deBoer and Meyer).

## Offloading Operation

On July 11, 1980, the "American Legend" was docked at Blount Island, Jacksonville, Florida and was awaiting offloading. The plaintiff, Harrington and Company (hereinafter "Harrington"), was hired by U.S. Lines as stevedore to offload the containers from the "American Legend." Harrington, as stevedore, hired longshoremen from the hiring hall of the International Longshoremen's Association, Local 1408, to do the actual offloading. Each "gang" of longshoremen hired is supplied by the hiring stevedore with a "header" who regularly and customarily explains the stevedore's instructions to the longshoremen. In the absence of a header, the stevedoring superintendent instructs and directs the longshoremen in carrying out their work on the vessel. Harrington's onsite representatives during the offloading of the "American Legend" were its stevedore superintendent, Dowe deBoer, and its assistant stevedoring superintendent, William McDowell. McDowell and deBoer were in charge of the stevedoring operation for Harrington and regularly gave orders to longshoremen in directing the offloading.

The offloading procedure resembles the onloading process in reverse. The spreader bar is lowered by crane onto the container located in the hold of the vessel, and then raised with the attached container. The container is lifted from the vessel and deposited on a chasis drawn by a motorized tractor. This procedure takes approximately two and one-half minutes per container. Occasionally this procedure is interrupted. It is not unusual for longshoremen to go into the vessel hatches to perform certain functions. These include rigging of auxiliary equipment to help remove damaged containers or containers which will not accommodate the spreader bar and closing of container doors.

When a stored container's doors are open, the container cannot be properly lifted from its position within the ship. Open

doors tend to catch, locking the container in its position. Removing the container in these situations may cause damage to the container, its cargo, or the vessel itself. Container doors must be closed in order to load the container; however, a door may be closed but unlatched and still be loaded. (Testimony of deBoer). During unloading, the weight of the spreader bar and the force of the impact when it is lowered onto a container may pop open doors that were closed but not properly latched. (Testimony of deBoer and Meyer). Thus, open container doors do not usually become apparent until the spreader bar has been attached and the crane operator has attempted to remove the container. (Testimony of deBoer and Meyer).

Containers with open doors are a common problem and did occur frequently prior to the time of the accident. (Testimony of deBoer, McDowell, Brown and Gavin). In September 1979, while Harrington was stevedoring the defendant's vessel "American Archer," four empty containers below deck were found to have open doors. In removing these containers from the hatch, two suffered extensive damage. As a result of this occurrence, deBoer, the stevedoring superintendent, asked John Meyer, the defendant's operation's manager at Jacksonville, to write a memorandum in an effort to prevent further such accidents. (Testimony of deBoer).

When open container doors are discovered, the stevedore's superintendent or a longshoreman descends into the hold of the ship to close the doors so that the container can be removed. Usually longshoremen descend into the hold by riding down on the spreader bar. The spreader bar is equipped with a rectangular metal cage in which an individual can stand while riding on the spreader. (Plaintiffs' Exhibit 3B). Another means utilized by longshoremen to gain access to the ship's hold is a hatch's access ladder normally located between the hatch covers. Harrington's standing instructions to the header and assistant stevedore were that longshoremen were to enter the hatches via the vessel access ladder or, if a ladder were unavailable, to ride the spreader bar. (Testimony of deBoer).

### The Accident

On the morning of July 11, 1980, Harrington began its offloading operations of the "American Legend." After discharging two empty containers from Cell # 2 (second cell in from the portside) of Hatch # 3, the crane operator discovered that the third container in Cell, # 2, Container No. 4112518, could not be removed. The longshoreman operating the crane had lowered the spreader bar onto the top of the container and had attempted to pull it out. The container could not be removed because its doors were open and had caught under the hatch coaming. Standing aft of Cell # 2, Hatch # 3 at the time the open doors were discovered, were the hatch tender, longshoreman Mitchell Brown, the decedent, longshoreman Robert Sumpter, longshoreman Smith Gavin, Jr., and Harrington's assistant stevedore McDowell. The longshoremen's header was not present.

Brown, who was in radio contact with the crane operator, stated that someone would have to go into the hatch to close the open doors, and Sumpter answered that he would. At that point, McDowell said to Sumpter, Gavin, and Brown, "Wait a minute. I'll get something to close the door." However, after McDowell had left the three men, Sumpter proceeded into the hatch climbing up to the top of the hatch coaming, located at the aft, portside of Hatch # 3, and onto the second container guide toward the center of the hatch. While Sumpter was entering the hatch, Brown told him to go down into the hatch on the spreader bar. When Sumpter continued to descend using the container guide, Brown told him again to use the spreader bar. As Brown was watching Sumpter continue down the container guide, he saw Sumpter slip when he was about halfway down the hatch. Sumpter fell to the bottom of the hatch into the empty space under the two containers loaded portside of the hatch. During the fall,

Sumpter's head struck a crossbeam in the hatch. As a result of these injuries, Robert Sumpter died.

## CONCLUSIONS OF LAW

Prior to 1972, an injured longshoreman could recover against the vessel owner if he could prove that he had been injured as a result of the unseaworthiness of the vessel. Under this broad standard, the vessel owner was liable even if the unsafe condition had been created by the stevedore. In 1972, Congress amended the LHWCA, substituting negligence for unseaworthiness as the ship owner's standard of care. Under the present standard, the vessel owner is liable only for the failure of the vessel or its owner to exercise reasonable care. 33 U.S.C. § 905(b).

The United States Supreme Court has recently defined the scope of a vessel owner's duty of care to the stevedore and its hired longshoremen. In *Scindia Steam Navigation Co. v. De Los Santos,* 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981), the Supreme Court differentiated between the duty owed by a vessel owner for conditions arising during the stevedore's operations and the duty owed for conditions existing prior to or contemporaneous with the commencement of the stevedore's operations. *See also Hill v. Texaco, Inc.,* 674 F.2d 447, 450–51 (5th Cir.1982).

The *Scindia* Court limited the vessel owner's liability once the stevedore has commenced its operations, stating that the owner has no general duty by way of supervision or inspection to discover dangerous conditions that develop in the cargo handling area assigned to the stevedore. *Scindia,* 451 U.S. at 172, 101 S.Ct. at 1624; *Pluyer v. Mitsui O.S.K. Lines, Ltd.,* 664 F.2d 1243, 1246 (5th Cir.1982). The policy underlying this holding had been expressed earlier when the Court had recognized that the stevedore is in the best position to avoid accidents during cargo operations and that the vessel owner should be allowed to rely on the stevedore's expertise and warranty to perform his work competently. *Ryan Stevedoring Co. v. Pan-At-lantic Steamship Corp.,* 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956); *see generally, Hunter v. Reardon Smith Lines, Ltd.* 719 F.2d 1108 (11th Cir.1983); *Hill v. Texaco, Inc.,* 674 F.2d at 450.

■ There are, however, circumstances that occur in the offloading operation in which the vessel owner will not be allowed to rely on the stevedore's competence. The owner has the duty "to avoid exposing longshoremen to harm from hazards they may encounter in areas, or from equipment, under the active control of the vessel during the stevedoring operation." *Scindia,* 451 U.S. at 167, 101 S.Ct. at 1622. Additionally, if the vessel owner is aware that the stevedore knowingly uses defective equipment that presents an unreasonable risk of harm to the longshoremen, the owner has a duty to intervene and eliminate or neutralize the hazard. *Id.* at 175–176, 101 S.Ct. at 1626; *Hill,* 674 F.2d at 451.

■■ The Court finds that the condition that is the subject of this litigation, the unsecured container doors, did not arise during the stevedoring operation but existed prior thereto. Prior to turning the vessel over to the stevedore for offloading, the owner has a duty to exercise:

ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety to persons and property, and to [warn] the stevedore of any hazards on the ship or with respect to its equipment that are known to the vessel or should be known to it in the exercise of reasonable care, that would likely be encountered by the stevedore in the course of his cargo operations and that are not known by the stevedore and would not be obvious to or anticipated by him if reasonably competent in the performance of his work.

*Scindia,* 451 U.S. at 167, 101 S.Ct. at 1622 (citing *Marine Terminals v. Burnside Shipping Co.,* 394 U.S. 404, 416 n. 18, 89

S.Ct. 1144, 1151 (1969)). Additionally, the vessel owner may have the duty to correct a defective condition he knows exists at the commencement of the stevedoring operation when the defect creates an unreasonable risk of harm to the longshoremen and the vessel owner knows that he cannot rely on the stevedore to protect the longshoremen from that risk. *Scindia*, 451 U.S. at 175–6, 101 S.Ct. at 1626; *Lemon v. Bank Lines, Ltd.*, 656 F.2d 110, 115 (5th Cir. 1981).

■ The vessel owner fulfilled his duty under *Scindia* to exercise reasonable care in the delivery of a ship that was safe for the stevedore to conduct his offloading operations. Unsecured container doors are not a defect as that condition has been defined by *Scindia* and its progeny. The unsecured doors on Container No. 4112518 did not themselves pose a risk or hazard to Harrington and its longshoremen beyond that normally encountered in the offloading of a vessel. Unsecured container doors commonly occur within the normal realm of stevedoring and are anticipated and dealt with by the stevedore and longshoremen in the exercise of their professions.

■ Even if the unsecured doors were a defect for which the vessel owner had liability, the owner would only be responsible for warning the offloading stevedore and its longshoremen of a condition that is "not known by the stevedore and would not be obvious to or anticipated by him if reasonably competent in the performance of his work." *Scindia*, 451 U.S. at 167, 101 S.Ct. at 1622; *Hunter*, 719 F.2d at 1110; *Helaire v. Mobil Oil Co.*, 709 F.2d 1031, 1036 (5th Cir.1983). As the facts have established, unsecured container doors are generally known by stevedores and longshoremen to occur in the offloading process. There was evidence that this particular stevedore had dealt previously with open container doors on a similar vessel. Anticipation of this condition had prompted the establishment of procedures in the industry for dealing with the problem of open doors on containers loaded in the hatch space of a vessel. Moreover, the

Court finds that specific knowledge of the unsecured doors on Container No. 4112518 in this case became known to the stevedore and to the longshoremen when the attempt was made to remove the container. The knowledge came as a result of normal stevedoring operations and in advance of the fatal accident of Robert Sumpter. Even a duty to warn on the part of the vessel owner would be obviated by the stevedore and longshoremen's obvious knowledge of the condition.

■ The only instance when a warning may be insufficient to relieve a vessel owner of liability is when the defect creates an unreasonable risk of harm. *Scindia*, 451 U.S. at 175–6, 101 S.Ct. at 1626; *Lemon*, 656 F.2d at 115. Even if the unsecured doors were found to be a defect, they did not create an unreasonable risk requiring that the owner intervene and correct the condition. The same assertions made above regarding the stevedore and longshoremen's awareness that unsecured doors are commonly encountered and that they are systematically dealt with in the industry also support a finding that the unsecured doors did not pose an unreasonable risk.

■ Furthermore, the evidence indicates that the vessel owner is in the least effective position to intervene and correct the defect even if it did pose an unreasonable risk. The vessel owner has no duty to supervise the loading of cargo containers by the onloading stevedore. *Scindia*, 451 U.S. at 172, 101 S.Ct. at 1624. Once the forty-foot containers are loaded in the hold of the ship, the proximity of the stacked containers to each other makes it unreasonable to conduct an examination to determine whether the doors, which must be closed to be loaded, are in fact secured. Even if they were known to be open, the containers' proximity to one another makes securing container doors enroute often impossible. Therefore, whether a container's doors are secure is not usually discovered until the offloading stevedore attempts to remove the container and the unsecure doors actually open making removal diffi-

cult or impossible. Once discovered, the stevedore and its longshoremen follow established procedures for securing the container doors, usually descending into the hatch on the spreader bar or the hatch access ladder to latch the container's doors. Thus, once the unsecured doors are discovered and are in a position to be latched and secured, the stevedore is in full control of its offloading operation and the vessel owner is relying on his expertise. To place a duty on the vessel owner to intervene and latch the unsecured doors would require that he invade the offloading operations and perform a task that is a normal function of the offloading stevedore and its longshoremen.

Therefore, the Court finds that the defendant did not breach its duty to exercise ordinary care under the circumstances to deliver a ship that was safe for the stevedoring operation and free of defects. Defendant delivered the vessel in such condition that "an expert and experienced stevedore [should have been] able by the exercise of reasonable care to carry on its cargo operations with reasonable safety to persons and property ...." *Scindia,* 451 U.S. at 167, 101 S.Ct. at 1622. In this case, a tragic accident occurred when the stevedore went down into the ship; but the defendant had no duty to deliver the vessel in such condition that entry by a stevedore into the hold would never be necessary.

For the reasons set forth in this Opinion, the Clerk shall enter Judgment for the defendant.