**Joel W. GREEN, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

Case No. 3:07–cv–638–J–34MCR.

United States District Court,
M.D. Florida,
Jacksonville Division.

March 23, 2010.

Gary A. Bubb, Gary A. Bubb, PA, Ben J. Weaver, Harrell & Harrell, PA, Jacksonville, FL, Howard Thomas Sutter, Boyd & Sutter, PA, Jacksonville, FL, for Plaintiff.

Matthew J. Glomb, Sharon K. Shutler, U.S. Department of Justice, Washington, DC, Roberto H. Rodriguez, Jr., US Attorney's Office, Jacksonville, FL, for Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MARCIA MORALES HOWARD, District Judge.

On January 26, 2006, Joel Green was injured while performing contract repair work aboard the M/V CAPE EDMONT (Cape Edmont) for his employer, North Florida Shipyards, Inc. (NFSI). Plaintiff filed suit against the United States of America, owner of the vessel, for negligence, pursuant to the waivers of sovereign immunity contained in the Suits in Admiralty Act, 46 U.S.C. §§ 30901–30918(SAA), and the Public Vessels Act, 46 U.S.C. §§ 31101–31113(PVA),[1] and pursuant to the Longshore and Harbor Work-

ers' Compensation Act (LHWCA), 33 U.S.C. §§ 901–950.[2] NFSI, Plaintiff's employer, and American Longshore Mutual Association, Ltd. (ALMA), NFSI's LHWCA workers compensation carrier, joined the action as intervening parties pursuant to Rule 24, Federal Rules of Civil Procedure (Rule(s)).

The Court conducted a six-day bench trial in May 2009,[3] and thereafter, the parties submitted their proposed findings of fact and conclusions of law. *See* United States' Findings of Fact and Conclusions of Law (Doc. No. 101; Defendant's Proposed Findings and Conclusions); Plaintiff's Proposed Findings of Fact and Conclusions of Law (Doc. No. 102; Plaintiff's Proposed Findings and Conclusions). Having reviewed the pleadings, examined the evidence, observed the witnesses, and considered the arguments of counsel as well as the remainder of the record, the Court makes the following findings of fact and conclusions of law as required by Rule 52(a).

1. On October 6, 2006—after Plaintiff's accident, but before he commenced his suit—the SAA and PVA were recodified. Prior to October 6, 2006, the SAA was codified at 46 U.S.C. §§ 741–52 and the PVA at 46 U.S.C. §§ 781–90.

2. The LHWCA "authorizes covered employees to sue a 'vessel' owner as a third party for an injury caused by the owner's negligence." *Stewart v. Dutra Const. Co.*, 543 U.S. 481, 485, 125 S.Ct. 1118, 160 L.Ed.2d 932 (2005); *see also* 33 U.S.C. § 905(b). The SAA and PVA do not provide causes of action; rather, they constitute limited waivers of sovereign immunity by the United States and provide the "jurisdictional hook" for traditional admiralty claims against the government. *See Manuel v. United States*, 50 F.3d 1253, 1255 n. 1 (4th Cir.1995) (citations omitted); *see also O'Connell v. Interocean Mqmt. Corp.*, 90 F.3d 82, 85 (3d Cir.1996) (citation omitted); *Kasprik v. United States*, 87 F.3d 462, 465 (11th Cir. 1996) (citation omitted). The SAA waives sovereign immunity and provides the sole basis for jurisdiction over admiralty claims

against the United States that do not involve public vessels. *See Cranford v. United States*, 466 F.3d 955, 958 (11th Cir.2006) (citations omitted). The PVA waives sovereign immunity for claims involving public vessels. *See id.* Because the instant case involves a public vessel, "the lifting of the Government's sovereign immunity ... is governed exclusively by the provisions in the [PVA]." *See Marine Coatings of Ala. v. United States*, 71 F.3d 1558, 1560–61 & n. 3 (11th Cir.1996). However, the same substantive law governs regardless of whether the SAA or the PVA applies, and, procedurally, the PVA incorporates the provisions of the SAA "except to the extent inconsistent with" the PVA. *See id.; see also* 46 U.S.A. § 31103. Accordingly, this suit is brought against the United States under the LHWCA, pursuant to the waiver of sovereign immunity contained in the PVA, which incorporates most of the SAA.

3. Trial of this action has been bifurcated between liability and damages. At the bench trial, the Court heard evidence solely as to liability.

## I. Findings of Fact

### A. Background

The United States, through the Maritime Administration (MARAD), an agency within the Department of Transportation, owns the Cape Edmont, which is a public vessel. Marine Transport Lines (MTL) holds a long-term contract with MARAD to manage six vessels, including the Cape Edmont. In managing the Cape Edmont, MTL arranges for repairs and maintenance as necessary. At all times material to this suit MTL acted as an agent of the United States.

The Cape Edmont, a Ready Reserve Vessel, is berthed in Charleston, South Carolina. At the time of the incidents relevant to this action, it was on Reduced Operating Status (ROS) awaiting activation. While on ROS, the vessel's crew was reduced from twenty-eight members to ten, with chief engineer Frederick Mac-Neil serving as the highest ranking officer. As a MARAD Ready Reserve Vessel, the Cape Edmont is documented and inspected by the United States Coast Guard.

### B. Steel Renewal Project

While the Cape Edmont was docked at Detyens Shipyard in South Carolina, a surveyor determined that the steel in the vessel's ballast tanks did not meet the American Bureau of Shipping (ABS) specifications. This deficiency required the Cape Edmont to undergo a steel renewal project in order to maintain its certification with the Coast Guard. At the time of the discovery of the steel deficiency, the Cape Edmont was undergoing several other repair operations. MTL's crew was involved in, and to some extent preoccupied with, these other projects. Addition-

ally, MTL's normal port engineer was unavailable due to personal matters. The steel renewal project, which represented a substantial undertaking, involved sensitive work. Its late discovery put MTL "behind the eight ball" with respect to the Cape Edmont's Coast Guard certification, making timely completion of the steel renewal project important.

The steel renewal project was beyond the scope of Detyens contract, thus MTL put the project out for bid, eventually awarding it to NFSI. Additionally, because of both the substantial nature of the project and because of MTL's internal personnel conflicts, MTL elected to retain Clyde "Robbie" Roberts to act as port engineer for the steel renewal project. In contrast to NFSI, Roberts did not win the project by bid. Rather, MTL specifically chose him for the task because of his experience with steel and his prior work with MTL. Even if MTL's full roster of regularly employed port engineers had been available for the job, MTL still would have brought in Roberts, an outside specialist, due to the specialized and sensitive nature of the work.

### C. MTL's Contract with NFSI

After NFSI won the steel renewal contract by lowest bid, MTL retained NFSI to complete the necessary repair work. The contract between NFSI and MTL provided that NFSI was to furnish the labor, materials, and equipment necessary for its repair work, including ventilation equipment. The contract also called for NFSI to obtain marine chemist certification[4] that the work areas were gas free and safe for "hot work,"[5] requiring NFSI to obtain certification prior to commencing hot work

---

4. A more detailed discussion of the requirements and parameters of marine chemist certification is forthcoming. See infra Part I.G.

5. "Hot work" is work that involves burning or welding, that produces a source of ignition, or that uses fire- or spark-producing tools.

in the ballast tanks undergoing the repair operations and to maintain the certification throughout work on the project.

### D. MTL's Contract with Roberts

Rather than put the port engineer job for the steel renewal project to bid, MTL specifically chose and retained Roberts for the job because of his experience working with steel and with MTL. Roberts testified that he works as a "private contractor, basically a consultant, in the marine industry."[6] Roberts dealt directly with MTL, and was retained, paid, and supervised by MTL,[7] not MARAD.

Both Roberts and MTL understood Roberts to be an independent contractor, and not an MTL employee. In contrast to MTL's employees, Roberts did not receive employment benefits. He was not paid a regular salary; rather, he sent invoices to MTL for his work. MTL retained Roberts for the specific purpose of supervising the steel renewal project and two additional minor projects.[8]

The contract between Roberts and MTL was oral and was not reduced to writing.[9] The terms of the contract provided for Roberts to ensure that NFSI timely and satisfactorily completed the steel renewal project to the correct technical specifica-

tions. Ernie Otterspoor, MTL's president and CEO, supervised Roberts's performance of his contract. Otterspoor retained Roberts and was familiar with the terms of his agreement. Based upon Otterspoor's understanding of the agreement, Roberts had no specific safety responsibility, but he was supposed to bring any safety hazards he noticed to NFSI's attention. Otterspoor understood Roberts to have the obligation to bring to NFSI's attention anything he noticed that, safety wise, was hazardous or inappropriate. Roberts also understood part of his job to be to ensure that NFSI followed appropriate safety procedures. For example, although Roberts did not view it as his job to ensure that ventilation for hot work aboard the Cape Edmont was adequate, he did view it as his responsibility to monitor ventilation and get any deficiencies he noticed corrected. Roberts had authority to shut down the project, if necessary, to rectify unsafe working conditions.

### E. MARAD Involvement

#### 1. Roberts Contact with MARAD

Roberts had no direct contact with any government agency, including MARAD. He dealt exclusively with MTL. MARAD did not reimburse MTL for Roberts's sala-

---

**6.** Roberts sent invoices for his work to MTL on behalf of his company, Independent Marine Consultants, Inc., (IMC). It is unclear whether payments were made directly to Roberts or to IMC.

**7.** Correspondence submitted by Roberts identified him as "president" of IMC and represented that MTL was one of his company's "Clients and Associates in the Marine Industry."

**8.** There was no special contract for the two additional projects. They were part of the same oral agreement as the steel renewal project.

**9.** The Court heard conflicting testimony as to a written purchase order between Roberts and MTL with three pages of terms and con-

ditions attached. No purchase order was entered into evidence. Defendant introduced three pages of terms and conditions, which it contends were attached to Roberts's purchase order. The terms and conditions entered into evidence however, are dated August 2006, after the accident. No terms and conditions predating the accident were introduced into evidence. Because the testimony was equivocal as to whether the terms and conditions, if any, Roberts received were identical to the August 2006 terms and conditions admitted into evidence, the Court declines to rely on the August 2006 terms and conditions as representative of any agreement between Roberts and MTL at the time of his work aboard the Cape Edmont in January 2006.

ry. Roberts did not report to MARAD and was not supervised by MARAD. Indeed, throughout his work on the Cape Edmont, Roberts never dealt with MARAD.

### 2. MTL Contact with MARAD

As MARAD's ship manager and agent, MTL's interaction with MARAD was generally through MARAD's contracting officer's technical representative (COTR), Jesse Whittaker. As the COTR, Whittaker made sure that MTL performed its ship management duties in accordance with its contract with MARAD. This job required Whittaker to periodically visit the MTL-managed vessels, including the Cape Edmont, to document repair work and ensure appropriate funding. As part of his general oversight, Whittaker, usually accompanied by Otterspoor, generally spent "a minimum amount of time, no more than a few minutes on each ship."

### F. Ship Structure

The Cape Edmont is a RO/RO, or roll-on/roll-off, vessel, meaning it is specifically designed to have cargo vehicles drive on and off the ship. The vessel has a retractable stern ramp that provides access to the "B deck" of the vessel. Workers aboard the Cape Edmont used this ramp to board and exit the ship. Below B deck, toward the aft end of the ship, the vessel has starboard and port ballast tanks, separated in the center by the steering gear flat and steering equipment.

### G. Beginning Work on the Project

NFSI began work on the steel renewal project on January 16 or 17, 2006. NFSI used approximately 10 to 12 employees, most of whom began work on the first day but some of whom filtered in later. On the first day of the project, NFSI workers primarily unloaded equipment and set up for the job. The second day, they were assigned to their work spaces. Jim Burgess, who supervised the project on behalf of NFSI, acted as Plaintiff's second-line supervisor and passed out the work assignments. Giau Tran acted as Plaintiff's first-line supervisor. On January 17, NFSI began hot work on the Cape Edmont, and on January 20 or 21, NFSI specifically began hot work within the starboard aft peak tank of the Cape Edmont. Plaintiff's accident occurred in connection with hot work within the starboard aft peak tank on January 26, 2006.

### H. Marine Chemist Certification

Prior to beginning hot work, OSHA regulations require certification by a marine chemist that the workspace is safe for hot work. Burgess brought in David Miller of Marine Environmental Testing, Inc. (MET) to perform the necessary inspections. When Miller arrived on the morning of January 17, hot work had not yet begun. Miller, a National Fire Protection Association (NFPA) certified marine chemist since 1990, inspected the port aft peak tank, the center aft peak tank, the starboard aft peak tank, and the aft steering gear room. Under OSHA requirements at the time, to certify a space as safe for work, Miller was required to determine: (a) that oxygen content of the atmosphere was at least 19.5% and below 22% by volume; (b) that the concentration of flammable vapors was below 10% of the lower explosive limit (LEL); [10] (c) that the carbon monoxide level in the atmosphere did not exceed thirty-five parts per million; (d) that any toxic materials in the atmosphere were within the permissible exposure limits; and (e) that any residues or materials associated with the authorized work would not be hazardous.

---

**10.** The LEL is the minimum concentration of vapor in air below which propagation of a flame does not occur in the presence of an ignition source.

Miller conducted the tests using a four-gas meter. He calibrated the instrument prior to using it by testing a known gas concentration. Miller checked the gas levels at the entrance to each space and throughout the entire space to be tested, recording his results. Miller's instruments gave a real-time reading of the gas levels, enabling him to continuously test throughout a given space. He did not need to stop to test a given area. Specifically with respect to the starboard aft peak tank, on January 17, Miller measured an oxygen level of 20.9%, a carbon monoxide level of zero parts per million, and an LEL of zero percent. In addition to the gas readings, Miller also performed a visual inspection of the tested areas. Miller spent about two to three minutes each in the port and starboard tanks, about ten to fifteen minutes in the center tank, and a couple of minutes in the steering room. His total inspection lasted approximately thirty minutes. Following his inspection, Miller certified each of the four areas as safe for workers and safe for hot work, instructing NFSI to maintain fire watch. The certification was posted on each of the inspected areas.

## I. Competent Person Inspection

For hot work to continue in an area after it has been certified as safe by a marine chemist, OSHA regulations require testing and inspection by a competent person "as often as necessary to ensure that atmospheric conditions within that space are maintained within the conditions established by the certificate after the certif-

icate has been issued." The industry standard under normal working conditions calls for daily inspection by a competent person. As with the marine chemist certification, the daily competent person inspection was posted on each of the inspected areas with copies provided each morning to Burgess, Roberts and Mac-Neil. Typically, the working company, in this case NFSI, performs the daily checks using its own competent person. In this particular project, however, MET, performed the daily competent person checks for January 18–21, until NFSI took over the task on January 22. On January 18–19, an MET employee other than Miller performed the competent person inspections. Each of the four inspected areas passed, with instructions left to maintain ventilation and maintain fire watch. On January 20–21, Miller personally performed the competent person inspections. At the time Miller performed the competent person checks, the workers were in the spaces working. Miller saw no indication that ventilation was inadequate, and his instruments did not indicate inadequate ventilation. He generally recalls seeing ventilation equipment, and no one ever suggested to him that ventilation was inadequate. He never observed inadequate ventilation or concluded that ventilation was inadequate. Miller gave passing marks to each of the four inspected areas, leaving instructions to maintain ventilation.[11]

On January 22, NFSI took over the competent person duties. NFSI's competent person forms show that on January 24–26,[12] an NFSI competent person in-

---

**11.** Throughout the competent person inspections by MET, the gas levels in each area remained constant with one exception. Each day, testing in each area revealed an oxygen level of 20.9%, an LEL level of zero, and a toxic level of zero. The carbon monoxide level in each area was zero on January 18–20,

however on January 21, tests in each area revealed a carbon monoxide level of four parts per million, still well within OSHA limits.

**12.** Although only the NFSI competent person forms for January 24–26 were entered into

spected and approved the port aft peak tank, starboard aft peak tank, center aft peak tank, and aft steering gear room as safe for hot work and safe for workers.[13] Specifically, on January 26, 2006, the date of Plaintiff's accident, an NFSI competent person approved the starboard aft peak tank, the location of Plaintiff's accident, as safe for hot work and safe for workers.

### J. Plaintiff's Work in the Starboard Aft Peak Tank Preceding the Accident

At the time of the steel renewal project, NFSI employed Plaintiff as a first-class ship-fitter.[14] Plaintiff had approximately twenty-six or twenty-seven years experience as a ship fitter and welder. Plaintiff had worked on and off for NFSI, and, at the time of the steel renewal project, he had worked for NFSI continuously since he was most recently rehired, in December of 2005. NFSI initially assigned Plaintiff to work in the starboard aft peak tank with Paul Degrove, another experienced ship fitter and welder.

The starboard aft peak tank is a confined space. To access the starboard aft peak tank, the workers first had to go through a hole that had been cut in the B deck. From this area that was accessed through the hole in the B deck, the workers would then need to climb through one of two or three holes in a longitudinal[15] bulkhead to enter the starboard aft peak tank. Within the starboard aft peak tank, a transverse swash bulkhead runs port to starboard along frame zero of the ship.[16] Although there was conflicting testimony as to the number of holes in this particular swash bulkhead that the workers used as man-way holes to move throughout the ship, the Court determines that the swash bulkhead running along frame zero of the ship contained two such holes. Plaintiff's particular workspace within the starboard aft peak tank was aft of the frame-zero swash bulkhead.

The bottom of the starboard aft peak tank is not flat. Rather, the hull of the boat forms the shape of a shallow "v," narrowing towards the keel (or inboard of the starboard aft peak tank) and then rising. Additionally, transverse structural frames run across the floor of the tank. These frames are approximately three feet tall, and movement within the tank requires a worker to either climb or crawl over these frames.

Plaintiff and Degrove began hot work within the starboard aft peak tank on January 20th or 21st. At this time, MET had already performed the initial marine chemist certification permitting hot work within

---

evidence, the undisputed testimony at trial, accepted by the Court, is that an NFSI competent person inspected and approved the port aft peak tank, starboard aft peak tank, center aft peak tank, and aft steering gear room as safe for hot work and safe for workers on a daily basis beginning on January 22.

13. The NFSI competent person forms are initialed by an individual with a first initial as "R" and last initial of "F." NFSI's only certified competent person in January of 2006 with those initials, Ray Foster, is now deceased. Jim Spivey, NFSI's personnel and safety director, testified that NFSI competent persons use meters to measure gas levels when performing competent person checks.

14. A ship fitter is in charge of cutting out material to be replaced, in this case steel, and placing its replacement for welding.

15. A longitudinal bulkhead refers to a bulkhead that runs forward to aft. A transverse bulkhead refers to a bulkhead that runs port to starboard.

16. A swash bulkhead is a solid wall with openings designed to reduce the "swashing" action of a tank's liquid content as a ship moves at sea. Thus, the non-tight swash bulkhead hinders, but does not prevent, the flow of liquid as the ship moves at sea.

the starboard aft peak tank and was still performing the competent person checks. Because the starboard aft peak tank was a confined space, OSHA regulations required hot work in the tank to be accompanied by appropriate ventilation. There are two different types of ventilation. Positive ventilation, or "blowing," involves moving air inside a space. Negative ventilation, or "sucking," involves pulling air out of a space.

NFSI provided ventilation to its workers aboard the Cape Edmont in the form of air socks attached to mechanical fans. The mechanical fans were located on B deck, and the attached air socks ran through access slots cut in the deck to the ship's lower level. The open end of the air socks were lightweight, portable, and easily moved by the workers below deck. Two different color socks were in use on the Cape Edmont. Red socks, sometimes referred to as pink, were used to provide positive ventilation.[17] The red socks were incapable of providing negative ventilation. When operative, the red socks inflated, but when inoperative, they collapsed. Yellow socks were primarily used to provide negative ventilation. In contrast to the red socks, however, the yellow socks were capable of providing either positive or negative ventilation. To prevent the yellow socks from collapsing or contracting when providing negative ventilation, they were lined with a coil metal framing. Thus, unlike the red socks, the yellow socks remained in the same expanded position regardless of whether they were being used.

Requiring ventilation for hot work within a confined space serves multiple safety purposes. It ensures that workers can see

properly, it ensures that workers can breathe properly, and it reduces the risk of hazard from fire or explosion. The parties agree that OSHA regulations dictated the necessary level of ventilation for hot work aboard the Cape Edmont in conjunction with NFSI's performance of the steel renewal project. Nonetheless, there was some dispute as to the industry standard for adequate ventilation. Plaintiff's expert witness, Robert Harshman, suggested that adequate ventilation required a specific and measurable frequency of complete air exchanges. However, not only was Harshman's testimony as to the necessary frequency of air exchanges inconsistent,[18] it was also based on Navy regulations that both parties agreed were inapplicable to the Cape Edmont. Harshman, as well as all other witnesses who testified as to the requisite ventilation, agreed that OSHA regulations do not require any specific number of air changes over a specific period of time. Rather, OSHA regulations require ventilation sufficient to remove smoke and welding fumes so as to maintain the working atmosphere in safe condition.

It is undisputed that the starboard aft peak tank was a confined space. However, Plaintiff contends that his particular workspace within the starboard aft peak tank—the area aft of the transverse swash bulkhead running along frame zero of this ship—was a "confined space within a confined space," and thus, any measure of compliance with the standard of care governing ventilation he was provided must account specifically for ventilation air socks within his particular portion of the

---

17. At some period of time, clear socks may have been used instead of red socks. Other than color, the clear socks were identical to the red socks and served the same purpose.

18. Harshman's articulation of this measurable frequency was inconsistent. First, Harsh-

man said the appropriate requirement was three air exchanges per hour. He clarified that he meant to say three air exchanges per minute. Later, however, Harshman said that he thought the correct standard was one air exchange per three minutes.

starboard aft peak tank rather than it as a whole. The Court finds credible testimony to the contrary and concludes that there is no such industry practice or requirement to sub-compartmentalize a confined space for the purpose of measuring or providing ventilation. Miller, the certified marine chemist and witness to whom the Court ascribes the greatest understanding and familiarity with OSHA requirements for hot work within confined spaces, testified that, despite the framing within the starboard aft peak tank, "the tank is the tank" and for purposes of OSHA requirements "there [are] no sub-compartments in the starboard aft peak tank." He further testified that, with respect to the marine industry standard for testing and certifying tanks as safe for hot work, he has neither heard of, nor himself performed, separate reports for spaces in between swash bulkheads within a single tank.

The testimony as to the timing and level of ventilation provided in the starboard aft peak tank during the days preceding the accident was in conflict. As to the initial period, when Plaintiff was partnered with Degrove, Degrove testified that when hot work began in the starboard aft peak tank, there was no ventilation whatsoever as the supply truck with materials had not yet arrived. However, Plaintiff testified that NFSI workers spent the first day of work unloading materials from the supply truck. Both Plaintiff and Degrove testified that ventilation was to some extent inadequate when they began hot work in the starboard aft peak tank, but that they eventually received proper ventilation equipment. At some point after Degrove left, Plaintiff was assigned to work with Mary Chamberlain, a tacker.[19] Plaintiff worked with Chamberlain as his assigned helper for approximately four days prior to the accident. Plaintiff testified that when Degrove left the starboard aft peak tank, he took the ventilation with him. He also testified that air socks that were either inoperative or not attached to mechanical fans were led down the access slot below B deck to give a marine chemist, competent person, or other inspector the false impression that the starboard aft peak tank was ventilated when it was, in fact not.[20] Plaintiff testified that on one day preceding the accident he was so concerned regarding the lack of ventilation that he refused to work, but later returned to work upon being provided some ventilation equipment.

In sum, Plaintiff, supported somewhat by the testimony of Degrove, testified that his ventilation on dates preceding the accident was inconsistent and generally inadequate. Plaintiff testified that he complained to various individuals about the lack of ventilation. Most of these complaints, he testified, were lodged to his NFSI supervisors, Tran and Burgess. However, he testified that he complained to anyone he could find, including an unidentified person he knew not to be an NFSI employee who was wearing white overalls and who was responsible for posting daily certification outside the tank to allow hot work. In contrast to Plaintiff's accounts regarding ventilation prior to the day of the accident, Chamberlain testified that throughout her work in the starboard aft peak tank she observed ventilation. Similarly, NFSI supervisors Tran and Burgess, port engineer Roberts, and marine chemist and competent person Miller

---

**19.** A tacker fits material together with "little tacks of weld" to hold it in place until the welders can come back and weld it in place.

**20.** The Court makes note of this testimony because if NFSI's "trickery" was sufficient to fool a certified marine chemist or competent person, it would also be sufficient to fool an MTL crew member, none of whom were specially trained regarding ventilation.

all testified that in the numerous times they passed by or actually entered the starboard aft peak tank they observed what appeared to be adequate ventilation.

The Court need not resolve all of the conflicting testimony regarding ventilation prior to the date of the accident because the ventilation adequacy at that time is not dispositive. What is potentially dispositive, however, is the extent to which any MTL or government representative either knew or should have known of any ventilation inadequacies. To the extent such inadequacies may, from time to time, have existed, no complaints thereof or notice was given to any MTL crew member, or even to Roberts. Roberts and MacNeil each testified that they neither knew, nor were advised of, any ventilation inadequacies.[21] Indeed, Plaintiff did not recall seeing Roberts during his work on the project, referring to Roberts as "a ghost." [22] Likewise, testimony or stipulated expected testimony of all MTL crew members aboard the Cape Edmont was that none were advised of ventilation inadequacies. Assuming, as Plaintiff testified, that he did complain to a person in white overalls about inadequate ventilation, the Court concludes that such person was not an MTL crew member. Based on Plaintiff's description of the individual's clothing and job description, the Court finds that he was either an ABS inspector or a marine chemist or competent person, but he was not an MTL crew member.[23]

At pertinent times during his work in the starboard aft peak tank Plaintiff used his own personal cutting torch. It is not uncommon for workers in the industry to use their own tools. Plaintiff had owned the particular torch for about three years prior to the accident. When he first purchased it, the torch had recently been re-serviced, but during the three years he owned the torch Plaintiff never had it serviced.

Although torch leaks are preventable with proper maintenance, it is not uncommon in the industry for torches to leak from time to time. Industry standard safety procedures call for workers to test their torch at the beginning of each shift to ensure it is not leaking. NFSI policy allowed workers—even those using personal torches—to turn in a leaky torch and have proper maintenance performed at NFSI's expense.

A few days prior to his accident, Plaintiff realized that his torch was leaking. Specifically, in response to a random spark, Plaintiff observed his torch light and hold a small flame, similar to that of a

21. Although DeGrove testified that at one point he complained to MacNeil regarding ventilation deficiencies, he conceded that his memory regarding names and faces from his time aboard the Cape Edmont was poor. To the extent he may have complained at one point to MacNeil, however, the undisputed testimony is that subsequent to any such complaint proper ventilation was provided, at least until DeGrove left the starboard aft peak tank.

22. While the Court discredits this portion of Plaintiff's testimony and accepts Roberts's testimony that he physically visited the various work spaces, including the starboard aft peak tank, multiple times, *see infra* Part I.K, Plaintiff's recollection of never seeing Roberts supports the factual finding that Plaintiff did not complain to Roberts of any perceived ventilation deficiencies.

23. Plaintiff testified that he told a man in a white uniform that was using a meter to check the gas atmosphere about inadequate ventilation. The Court heard undisputed testimony that no member of MTL's crew was trained or certified as a competent person and that all competent person inspections aboard the Cape Edmont were performed by either MET or NFSI personnel. Also, the Court heard undisputed testimony that MTL crew members did not wear white overalls, but that ABS personnel, who boarded the Cape Edmont from time to time, routinely wore white coverall uniforms.

match, while it was turned off. Plaintiff was worried about his torch and knew that it required attention, however he did not attempt to service or fix his torch, and he did not trade his torch with NFSI for a temporary replacement to allow NFSI to have his torch serviced. Rather, he attempted to solve the problem by turning the gas knob off tighter. The only other person who knew of Plaintiff's leaky torch prior to the time of the accident was Chamberlain. On one occasion, Chamberlain saw Plaintiff's torch light while the gas knob was off. This led to an argument between Plaintiff and Chamberlain. Chamberlain pointed the leak out to Plaintiff, who told her not to worry about it. Additionally, Plaintiff grew aggravated when he felt that Chamberlain has exacerbating the hazard through placement of her tools in proximity to the leaking torch. Despite Chamberlain's concern, however, she did not bring Plaintiff's leaky torch to the attention of her supervisor or anyone else because she did not want to be a "rat."

### K. Roberts's Role in the Project

When Roberts arrived as port engineer for the steel renewal project on January 18 or 19, 2006, NFSI had already commenced work on the project. Although he also worked on two other small projects for MTL, Roberts spent about 95% of his time on the steel renewal project. Roberts acted as the ship's representative in his capacity as port engineer. Although he did not have authority to bind MTL to payment, he did, under authority from MTL, sign documents on behalf of MTL. He also negotiated change orders and fielded bids on MTL's behalf. From NFSI's perspective, Roberts was the vessel's quality as-

surance representative and NFSI's chief contact person with MTL.

Roberts involved himself in safety protocol for the project. Dissatisfied with the extent of the fire watch stations, he questioned Burgess and eventually coordinated with MacNeil to improve the quality and quantity of the fire watch stations.[24] When Roberts arrived on January 18th or 19th, he met with Burgess to discuss safety procedures and Roberts's overall requirements for the project. Roberts gave Burgess a card of safety procedures with which he and MTL expected NFSI to abide. He discussed requiring workers to wear proper dress and equipment, including hard hats and safety goggles. Although Roberts emphasized the need to maintain ventilation, he saw no need to harp on the issue because his observations were that NFSI was providing adequate ventilation. Roberts also testified that he emphasized, and Burgess acquiesced to, a specific rule of his—whenever workers left their work spaces below the decks, not only should the gas lines be disconnected from the gas source and the gas source turned off, but the torches and gas lines had to be "rolled up" and removed from the work spaces below deck. Burgess testified that he did not recall discussing Roberts's policy as to rolling up torches whenever workers left the work area. He testified that NFSI's policy, and the procedure utilized throughout the project, was not to completely roll up torches whenever workers left the work space. Rather, the policy NFSI followed throughout the project was to roll up the torches only at the end of the work shift. At other breaks, such as lunch time, the tanks were supposed to be turned off and the gas hoses disconnected, but the torches were not rolled up above deck. In resolving this

---

**24.** Although NFSI provided all other equipment for the project, MTL supplied fire hoses and allowed NFSI to use its fork lift. NFSI

did not use any ventilation equipment belonging to MTL.

conflict the Court finds Burgess's testimony to be credible and consistent with the other evidence presented at trial.

Roberts utilized an MTL office on a dock within 1,000 feet of the vessel, and he worked aboard the vessel—where he spent most of his time—daily. Insofar as the Court heard no evidence of set hours or directives from MTL, Roberts appears to have exercised independent discretion as to when and how long to work. While working aboard the vessel, Roberts physically crawled into the various work spaces, visiting each work space on average between six to fifteen times per day. Specifically, prior to Plaintiff's accident, Roberts was physically within the starboard aft peak tank "maybe hundreds of times" throughout the course of the project. Each time, he saw ventilation in the starboard aft peak tank, testifying that he had to move the air socks out of his way to get into the tank. In fact, Roberts thought the level of ventilation NFSI provided was to some extent "overkill." In addition to monitoring safety and progress, Roberts, using spray paint, marked for identification the steel to be removed, and was required to inspect and approve the placement of all renewed steel prior to its installation.

### L. Day of the Accident

Plaintiff arrived at work on January 26, 2006, the day of the accident, at approximately 6:00 a.m. When he arrived, he relieved the night shift workers and began work along with Chamberlain. Most of the work that morning was being performed on the port side of the ship. In fact, while other NFSI workers, including Herbert Amons, were working on the port side of the vessel that morning, Plaintiff and Chamberlain were the only two individuals working in the starboard aft peak tank. On that day, there was both positive and negative ventilation—a red and a yellow ventilation air sock—within the starboard aft peak tank, although the placement of the air socks may not have been optimal considering the location of Plaintiff's specific workspace within the starboard aft peak tank.[25] Nevertheless, the ventilation air socks were readily portable, and the workers were free to, and often did, move them as necessary. That morning, Roberts checked the competent person form to ensure that the starboard aft peak tank remained certified safe for hot work. He relied entirely on the combination of the original marine chemist certification and the daily competent person form to assure him that the ventilation visible to him was adequate.

At some time the morning of the accident, Otterspoor boarded the vessel to gauge the status of the ongoing repair work on the aft peak tanks. While in the center steering gear flat between the starboard and port aft peak tanks, he generally observed ventilation, both red and yellow air socks. Otterspoor testified that he observed various air socks operating, but he did not specifically pay attention to or recall the specific location of the air socks. At the time of the accident, Otterspoor was

---

**25.** Although Plaintiff testified to a complete lack of ventilation within the starboard aft peak tank on the day of the accident, his testimony was not credible or supported by the remainder of the evidence. Plaintiff's helper, Chamberlain, testified that the starboard aft peak tank was equipped with positive and negative ventilation on the day of the accident. So did Burgess and Tran. The Court was presented with ample evidence of the burnt remnants of a red and a yellow air sock. Indeed, one of Plaintiffs's own expert witnesses, Aaron Joseph Smith, testified that he believed there was ventilation within the starboard aft peak tank, but not in Plaintiff's specific (sub-compartmentalized) workspace. Likewise, Plaintiff's theory at trial was that there was ventilation within the starboard aft peak tank but not Plaintiff's specific workspace.

back at the office, no longer aboard the vessel. By the time Otterspoor returned to the vessel, emergency personnel had already arrived. Not wanting to interfere with the emergency personnel, Otterspoor, accompanied by Whittaker, who was also in town, stayed on the ship's ramp.

The day of the accident was also a pay day. At some point that afternoon, Burgess distributed paychecks and allowed the workers to leave the vessel to cash their checks. Burgess alone made the decision to release the workers, and Roberts was neither present when the checks were distributed nor when the workers were released to cash them, When the workers left to cash their checks they did not do so in unison.[26] Some took their own vehicles individually, while others carpooled in a company van. NFSI did not restrict the workers as to where they could cash their checks. Some took their checks to a bank, while others went to a check-cashing location. The check cashing location was closer to the vessel, and while it usually took workers who went to the check-cashing location approximately twenty or thirty minutes to cash their checks and return to the vessel, it generally took workers who went to the bank about twice that long.

When Plaintiff left the Cape Edmont to cash his check, he turned his torch off, but left it unattended in his workspace in the starboard aft peak tank. He did not roll up his torch from the confined space nor did he disconnect his torch hose from the gas source at the manifold. He also failed to positively turn off the gas supply at the manifold. The testimony as to why Plaintiff failed to disconnect his torch or turn off the gas supply prior to leaving to cash his check was in conflict. Although testimony was unanimous that safety responsibility as to an unattended torch rests primarily with the individual worker, Plaintiff

testified that when he was heading to turn off his gas supply and comply with proper safety procedures he was hurried away by Burgess, who urged him to go cash his check. He testified that he accordingly assumed Burgess would turn off his gas supply for him. Burgess testified that he did not rush the workers off the ship, offer to turn off Plaintiff's gas supply, or offer to disconnect Plaintiff's torch.

The Court finds that Plaintiff's account of the events lacks credibility. The basic safety protocol for unattended torches is not intricate. It takes mere seconds to disconnect one's torch or turn off one's gas supply at the manifold. Industry standard makes such safety compliance the responsibility of the individual worker. Acknowledging that he hurt himself and "broke the Golden Rule" by not taking safety responsibility for his own unattended torch, Plaintiff testified that when he left the ship at Burgess's urging it was the only time in his twenty-seven years in the industry that he relied on someone else to turn off his gas supply or disconnect his hose for him. He conceded that he did so not in reliance on any affirmative statement by Burgess that he would turn off or disconnect Plaintiff's gas supply, but rather, on an assumption. He testified that he made this assumption knowing the danger of leaving a gas-supplied torch unattended in a confined space and knowing that his torch was leaking. The Court finds the credibility of Plaintiff's description of the events further strained by his testimony concerning his behavior upon returning from cashing his check. When Plaintiff returned from cashing his check, he did not go to reconnect his hose to the gas supply. Instead, he found that his torch was connected to the gas supply, which was turned on. Rather than consider that Burgess might not have acted on Plaintiff's assumption,

---

**26.** Although the workers were not required to leave and cash their checks, on the day of the accident, all NFSI workers did leave the ship at some time.

Plaintiff layered his assumptions, concluding that someone else must have reconnected his gas supply just prior to his arrival. Although the Court gives credence to Burgess's, rather than Plaintiff's, account of Plaintiff's failure to disconnect his hose or turn of his gas supply upon leaving to cash his check, the interplay between Burgess and Plaintiff when Plaintiff left the ship is ultimately of little consequence.[27]

Roberts was not present when Burgess distributed checks or when the workers left to cash their checks. However, approximately fifteen to twenty minutes before Plaintiff's return to the ship, Roberts arrived on B deck. There, standing near the access slot to the below-deck tanks and within sight range of the gas manifold, Roberts had a conversation with Burgess. During the course of their conversation, Roberts and Burgess at one point roamed to within approximately ten to fifteen feet of the gas manifold. The two spoke generally about progress on the project and the various work being done in different spaces. Although Roberts testified that he was unaware the workers had left the ship, the Court credits Burgess's testimony that Burgess told Roberts that the workers had left the shift to cash their checks. The Court also credits Burgess's testimony that when he and Roberts first started talking none of the workers had returned.

As mentioned, the workers did not cash their checks in unison. Their return to the ship was likewise staggered. A group of workers began to return about five to ten minutes after Burgess's conversation with Roberts began. Plaintiff returned a little more than one hour after leaving to cash his check. During that time frame, his leaking torch remained connected to its gas supply, unattended, in Plaintiff's workspace within the confined starboard aft peak tank. The torch uses two gases, oxygen and chemolene. Chemolene is highly flammable, and oxygen vigorously accelerates combustion. Both oxygen and chemolene are heavier than normal atmospheric conditions. For the time it was left unattended, Plaintiff's torch leaked both oxygen and chemolene into the starboard aft peak tank. Because of their heavy densities, both the oxygen and chemolene sank to the bottom of the ship, where they pooled in the area along the bottom of one of the three-foot-tall structural frames running across the floor of the tank. The pooled gas was, as events would unfold, incredibly hazardous, and, unfortunately, whatever the ventilation within the starboard aft peak tank, it did not remove the pooled gas.

Plaintiff returned to the ship before his helper, Chamberlain, had returned from cashing her check. Nevertheless, contrary to established safety policy, Plaintiff, without a helper, entered the starboard aft peak tank to commence work alone. His bulky protective gloves made it difficult to adjust the valves on his torch, so he attempted to light his torch prior to putting on the gloves. Plaintiff opened the gas valve on his torch and attempted to light it using his striker. The striker inadvertent-

---

27. As explained in the Court's conclusions of law, *infra* Part II, any negligence by Burgess is irrelevant to the determination of liability in the instant case. The relevant inquiry is whether Defendant, the United States or an agent thereof, breached a duty of care. If the United States is liable, the Court must then consider and apportion the percentage of comparative fault attributable to Plaintiff. Thus, if the Court concludes that Defendant breached a duty of care, then it must consider the interplay between Burgess and Plaintiff to the extent it is relevant to deducing Plaintiff's comparative fault. However, if Defendant has breached no duty of care to Plaintiff, then Plaintiff's recovery is nothing regardless of the extent of his comparative fault, and the Court need not determine Plaintiff's level of fault.

ly ignited the gas that had pooled in Plaintiff's workspace, causing an explosion or flash fire. Amons, who was working in the port aft peak tank, witnessed the event. He saw a large fireball stretch across the steering gear room separating the two tanks before withdrawing. Roberts, who was still standing up on B deck, described the sound as similar to a shuttle going off. On fire, Plaintiff threw his torch and made his way out of the starboard aft peak tank to the center of the ship.[28] Within a matter of moments, Amons, who had been working on the port aft peak tank at the time of the incident, reached Plaintiff to offer his assistance. An unidentified person above deck sprayed Plaintiff with water and was able to extinguish the fire. Amons assisted Plaintiff up to B deck, where co-workers provided assistance until emergency personnel arrived. Plaintiff suffered severe burns as a result of the accident.

After the accident, prior to engaging in additional hot work, NFSI summoned Miller to re-test and certify the port aft peak tank, center aft peak tank, starboard aft peak tank, and aft steering gear room. At approximately 6:50 p.m., on January 26, 2006, Miller, in his capacity as a certified marine chemist, re-certified all four locations, finding the atmosphere safe for workers and safe for hot work and leaving instructions to maintain a fire watch and ventilation.

## II. Conclusions of Law

### A. LHWCA

The parties agree that at the time of the accident, Plaintiff was a ship fitter engaged in repair work aboard the Cape Edmont and that he is covered under the LHWCA. "Prior to 1972, a [harbor worker] injured in the course of his employment could receive compensation payment from his employer ... or bring an action against the owner of the vessel and recover if he could prove that the owner's negligence caused his injuries or that the vessel was unseaworthy." *Clark v. Botelho Shipping Corp.*, 784 F.2d 1563, 1565 (11th Cir.1986). With respect to an unseaworthiness claim, "[n]o showing of fault on the part of the owner was necessary" and "[t]he shipowner could be held liable for the [harbor worker]'s injuries even if the [employer] created the unsafe condition." *Id.* However, Congress amended the LHWCA in 1972 "to shield shipowners from strict liability" and provide "for liability against the owner only in the event of the owner's negligence or the negligence of the vessel's crew." *See id.* The amendments "impose[d] a negligence standard rather than a standard of liability without fault," but the specifics of the standard were left to be resolved. *See id.*

In *Scindia Steam Nav. Co. v. De Los Santos*, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981), the Supreme Court "outlined the three general duties shipowners owe" harbor workers under the amended LHWCA. *See Howlett v. Birkdale Shipping Co., S.A.*, 512 U.S. 92, 98, 114 S.Ct. 2057, 129 L.Ed.2d 78 (1994). Although articulated in terms of stevedoring operations,[29] "[t]he *Scindia* standard is applicable to the employment of independent harbor contractors and their maritime employees[.]" *See Roach v. M/V*

---

**28.** The Court does not find credible Plaintiff's testimony that—on fire and temporarily blinded—he was able to run across the starboard aft peak tank and hurdle the various three-foot-tall structural frames running across the floor of the tank. Nonetheless, the specifics of how Plaintiff made his way to the center of the tank is impertinent to the resolution of this case.

**29.** A stevedore is "[a] person or company that hires longshore and harbor workers to load and unload ships." *Black's Law Dictionary* 1549 (9th ed.2009).

*Aqua Grace,* 857 F.2d 1575, 1581–82 (11th Cir.1988) (citing *Hill v. Texaco, Inc.,* 674 F.2d 447, 450–51 (5th Cir.1982)). Accordingly, the three *Scindia* duties control whether Defendant, as owner of the Cape Edmont, is liable to Plaintiff for his injuries.

**B. *Scindia* Duties**

The first *Scindia* duty, known as the "turnover duty," and its corollary, known as the "turnover duty to warn," concern "the condition of the ship upon the commencement of [repair] operations." *Howlett,* 512 U.S. at 98–99, 114 S.Ct. 2057. Stated succinctly, the twin turnover duties dictate that "[b]efore a [harbor contractor] begins work, a shipowner must turn over the ship and its equipment in a condition that permits a [harbor contractor] to do its work with reasonable safety, and must warn the [harbor contractor] of any hidden dangers of which it knows or should know." *Roach,* 857 F.2d at 1581: *see also Howlett,* 512 U.S. at 98–99, 114 S.Ct. 2057.

The second and third *Scindia* duties apply once repair operations are underway and impose differing standards of liability depending on whether the shipowner is actively involved in the operations, drawing a distinction "between an area controlled by the [harbor contractor] and one that is concurrently controlled by the [harbor contractor] and the shipowner[.]" *See Lampkin v. Liberia Athene Transport Co., Ltd.,* 823 F.2d 1497, 1501 (11th Cir.1987); *see also Howlett,* 512 U.S. at 98, 114 S.Ct. 2057. The second *Scindia* duty, the "active operations duty," provides that, after commencement of repair operations, a shipowner may be held liable if it " 'actively involves itself in the [repair] operations and negligently injures a [harbor worker] or if it fails to exercise due care to avoid exposing [harbor workers] to harm from hazards they may encounter in areas, or from equipment, under the active

control of the vessel during the [repair] operation.' " *Lampkin,* 823 F.2d at 1501 (quoting *Scindia,* 451 U.S. at 168, 101 S.Ct. 1614). However, "once [repair] operations have commenced, and absent contractual, legal or customary provisions to the contrary, the shipowner has no duty 'to exercise reasonable care to discover dangerous conditions that develop within the confines of the [repair] operations that are assigned to the [harbor contractor].' " *Id.* (quoting *Scindia,* 451 U.S. at 173, 101 S.Ct. 1614). Rather, "once an owner has relinquished complete control of the vessel to the [harbor contractor], primary responsibility for the safety of the [harbor workers] lies with the [harbor contractor,]" and the third *Scindia* duty, the "duty to intervene," merely requires that "if the shipowner learns of an apparently dangerous condition that presents an unreasonable risk or harm to the [harbor workers], it has a duty to intervene and remove the hazard." *Id.* (citing *Scindia,* 451 U.S. at 173, 101 S.Ct. 1614). In other words, "although … the determination of whether problems with the ship's gear pose an unreasonable risk of harm to the [harbor workers] is 'a matter of judgment committed to the [harbor contractor] in the first instance,' " where "the shipowner is aware that the ship's gear is malfunctioning, that the [harbor contractor] is nonetheless continuing to use it, and that the [harbor contractor]'s continued use of the gear is 'obviously improvident,' then the shipowner has a duty to intervene and repair the ship's gear." *Hunter v. Reardon Smith Lines, Ltd.,* 719 F.2d 1108, 1111 (11th Cir. 1983) (quoting *Scindia,* 451 U.S. at 175–76, 101 S.Ct. 1614). This duty to intervene is narrow, however—"[t]he shipowner must intervene only when it becomes aware that the ship, its equipment or gear poses a danger … *and* is also aware that the [harbor contractor] is acting unreasonably to protect the [harbor worker]." *Roach,*

857 F.2d at 1581; *see also Reardon Smith Lines, Ltd.,* 719 F.2d at 1112 (describing the duty to intervene as a *"very limited duty"*).

■ Accordingly, a shipowner's liability "depends upon whether [repair] operations had begun, and whether the shipowner was actively involved in the operations." *Lampkin,* 823 F.2d at 1501. When repair operations have begun, a shipowner that does not trigger the active operations duty may be held liable only if it has actual knowledge of a hazard and a harbor contractor's unreasonable failure to protect its employees, *Id.* Indeed, "[i]n such a case, the shipowner has a duty to intervene to protect the [harbor workers] only if it becomes aware that the ship or its gear poses a danger to the [harbor workers] and that the [harbor contractor] is failing, unreasonably, to protect the [harbor workers] . . . .'" *Id.* (quoting *Clark,* 784 F.2d at 1565). On the other hand, if the shipowner triggers the active operations duty, then the shipowner may be held liable if it has "constructive knowledge" of a hazard. *See* id The differing standards of liability contingent upon the degree of control exercised by the shipowner reflect sound policy—"[o]therwise, a shipowner would be free to ignore hazardous conditions that develop within areas under its exclusive or concurrent control, pending notification by the [harbor contractor]." *See id.* at 1502.

■ To trigger the broader active operations duty, the shipowner "must have substantially controlled or been in charge of (i) the area in which the hazard existed, (ii) the instrumentality which caused the injury, or (iii) the specific activities the [harbor contractor] undertook." *Davis v. Portline Transportes Maritime Int'l,* 16

F.3d 532, 540 (3d Cir.1994) (citations omitted). A shipowner may exercise the requisite control over an area "either because it never turned exclusive control of the area over to the [harbor contractor] but retained substantial control, or because the vessel substantially interfered, by invitation or otherwise, with the [harbor contractor]'s exercise of exclusive control, such as by actively intervening in the area." *id.* at 541. In contrast, a "vessel's mere reservation of the right to intervene to protect the ship's and its crew's interests, or to eject the [harbor contractor] at any time, does not amount to the substantial control necessary to trigger the vessel's active operations duty as long as the vessel does not exercise those reserved rights." *Id.* Thus, "a vessel owner will not trigger [the active operations] duty by having its employees board the vessel daily 'to ensure the security of the ship and to check on the progress of the contractor's work.'" *See Fontenot v. United States,* 89 F.3d 205, 208 (5th Cir.1996) (quoting *Futo v. Lykes Bros. Steamship Co.,* 742 F.2d 209, 210 (5th Cir.1984)); *see also Gonzalez v. United States,* 588 F.Supp.2d 747, 761 (S.D.Tex.2008) ("[T]he mere presence of a Government representative aboard a ship is insufficient to establish active control[.]").

### C. Conduct of Roberts

■ Prior to determining the duty owed Plaintiff and considering whether that duty was breached, the Court must address as a threshold issue whether conduct of Roberts is attributable to the United States.[30] Although all parties concede that MTL acted as an agent of the United States, Defendant argues that Roberts acted as a non-agent independent contractor

---

**30.** As discussed above, the duty owed Plaintiff is contingent in part on the degree of control exercised by the shipowner. *See Lampkin,* 823 F.2d at 1501–02. Thus, the Court considers whether Roberts's conduct is attributable to the United States as a threshold question— his conduct potentially impacts not only whether the United States breached the duty owed to Plaintiff, but also the antecedent question of what duty applies.

whose conduct cannot be attributed the United States. The argument is well taken.

Preliminarily, the Court notes that Plaintiff's theory of the case is not entirely clear. Specifically, it is unclear whether Plaintiff contends (a) that based upon the extent of control that MTL exercised over Roberts, he was tantamount to an employee of MTL such that his actions should be attributable to MTL, or (b) that irrespective of whether Roberts was an independent contractor, the extent of MTL's control over his actions makes him an agent of MTL. Nevertheless, regardless of which approach Plaintiff pursues, neither supports a finding that Roberts was an agent of the United States, the vessel owner.

The Court first considers Plaintiff's contention that Roberts was really an employee of MTL.[31] Under general common law, in determining whether a hired party is an employee or an independent contractor, a court considers "the hiring party's right to control the manner and means by which the product is accomplished." *See Cmty. for Creative Non–Violence v. Reid,* 490 U.S. 730, 751, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989).[32] The Supreme Court has articulated several non-exclusive factors relevant to this inquiry:

the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Id.* at 751–52, 109 S.Ct. 2166 (citations omitted).[33] Under this analysis, "how the employment relationship is described by the parties and the employment documents is considered but is not dispositive." *See Wolf v. Coca–Cola Co.,* 200 F.3d 1337, 1340 (11th Cir.2000). Weighing the various factors, the Court concludes that Roberts was an independent contractor, not an employee, of MTL Certain factors are irrelevant to the instant case. For example, there was no evidence that Roberts used any tools or had any assistants, and, while Roberts agreed to supervise two other small projects in addition to the steel renewal project, the Court has insufficient evidence to determine whether MTL had the right to assign him additional work or whether he had the option of accepting or declining additional tasks.[34] Although the

---

**31.** The parties agree that MTL acted as an agent of the United States, and the United States does not dispute that if Roberts was an employee of MTL, his conduct is attributable to the United States.

**32.** Similarly, Florida law generally provides that "if the one securing the services controls the means by which the task is accomplished, the one performing the service is an employee, if not, he is an independent contractor." *See Miami Herald Publ'g Co. v. Kendall,* 88 So.2d 276, 277 (Fla.1956); *see also Harper ex rel. Daley v. Toler,* 884 So.2d 1124, 1130–32 (Fla. 2d DCA 2004).

**33.** Florida law considers similar factors. *See Harper,* 884 So.2d at 1130–32.

**34.** The Court heard evidence that Roberts fielded bids on MTL's behalf and, on at least one occasion, accompanied Burgess and Tran around the vessel to show them other jobs NFSI might be able to perform for MTL aboard the vessel. The Court heard no evidence, however, as to whether this additional work was assigned to Roberts, or whether he voluntary assumed it on request from MTL.

location of the work—Roberts utilized MTL office space—and the fact that port engineer work was part of MTL's regular business weigh toward finding the existence of an employment relationship, the bulk of the factors weigh toward a finding of an independent contractor relationship. The port engineer job required a high level of skill. Indeed, MTL specifically chose Roberts because of his experience working with steel. Even if MTL's full roster of regularly employed port engineers had been available for the job, MTL still would have brought in Roberts, an outside specialist. The short duration of the parties' relationship on this occasion—the span of the specific project Roberts was overseeing—also weighs toward his status as an independent contractor. Roberts appears to have exercised independent discretion as to when and how long to work. In contrast to MTL's regular employees, Roberts did not receive employment benefits. His method of payment—he sent invoices on letterhead from his company, Independent Marine Consultants, Inc., to MTL based on his work—also suggests he was an independent contractor. While the Court did not hear evidence regarding Roberts's tax treatment, given that both Roberts and MTL considered him to be an independent contractor, it is likely he was treated as such for tax purposes. Also relevant, Roberts testified that he was "a private contractor, basically a consultant, in the marine industry." Viewing the totality of the relationship between Roberts and MTL, the Court concludes that MTL lacked control over the manner and means by which Roberts performed his port engineering services. Roberts was an independent contractor and not an employee of MTL.

The finding that Roberts was an independent contractor of MTL does not foreclose a finding that his conduct is attributable to the United States on a theory that he acted on its behalf as an agent. This case does not warrant such a finding, however, and the Court rejects Plaintiff's alternative theory of liability. The Court finds *Servis v. Hiller Sys., Inc.*, 54 F.3d 203 (4th Cir.1995) to be instructive. In *Servis*, the Fourth Circuit Court of Appeals considered whether "several contractors and subcontractors engaged to perform maintenance and repair tasks aboard a United States vessel" were "agents" of the United States for purposes of the SAA. *See id.* at 205. As in the instant case, *Servis* involved a vessel owned by the United States and managed by MTL as an agent of the United States. *See id.* In that case, MTL retained multiple contractors, who in turn commissioned subcontractors, to perform repair work on the vessel. *See id.* Applying basic principles of agency law, the Fourth Circuit held that neither the contractors nor the subcontractors could be considered agents of the United States because they were not subject to operational control by the government. *See id.* at 207–09 ("[T]he term 'agent' [must] be read to exclude governmental liability for the negligence of independent contractors who are engaged to perform limited tasks aboard government vessels and who are not subject to the United States' operational control."). The *Servis* court noted that none of the contractors or subcontractors at issue were " 'engaged by' the United States 'to manage and conduct the business of a government vessel[,]' " and to view them as government agents would "raise[ ] the specter of governmental liability for every act of negligence by a painter or plumber engaged to perform some limited task aboard a United States vessel[.]" *Id.* at 209.

Plaintiff attempts to distinguish *Servis* by arguing that *MTL* exercised sufficient operational control over Roberts to make him an agent. This misses the point, however, because the pertinent question is whether Roberts can be considered an agent of the United States, not whether he

may have been an agent of MTL. For this reason, Plaintiff's reliance on *LeBlanc v. United States,* 732 F.Supp. 709 (E.D.Tex. 1990), a Texas district court case, is similarly misplaced. In *LeBlanc,* a repair worker injured aboard a government-owned vessel sued the United States for his injuries. *See id.* at 711–12. There, pursuant to a general agency agreement with the United States, Connecticut Transport, Inc. (Connecticut), managed the vessel. *See id.* at 712–13. The plaintiff, a repair worker employed by Coastal Marine, premised his case on the acts and omissions of two individuals, Captain Cheney and Engineer Kraljevic. *See id.* at 713. Cheney, the vessel's port captain, and Kraljevic, stationed as port engineer to supervise the repair work, each worked for Connecticut. *See id.* at 712. In determining whether Cheney and Kraljevic were agents of the United States for purposes of the SAA, the *LeBlanc* court noted that "the proper focus is on their *relationship with the United States[,]* " that is, "whether they were acting as fiduciaries for the *United States,* with the *United States'* consent and subject to the *United States'* general control and direction." *See id.* at 714 (emphasis added) (citations omitted). The court held that they were properly considered agents of the United States because "they were on the vessel pursuant to a contract of employment with Connecticut Transport, the general agent for the United States"; "[t]heir selection was approved by the United States, and they were supervising repair work on a United States vessel and on its behalf"; and "[t]he United States maintained the right to control generally their activities." *See id.* at 714–15. The *LeBlanc* court found that although Connecticut hired

Cheney and Kraljevic, the United States had to approve their selection and directly reimbursed Connecticut for their wages. *See id.* at 714. Moreover, the court found that Kraljevic reported to both Connecticut and the United States, that "[a]ny repairs other than those planned prior to the vessel entering the shipyard" had to be proposed to Connecticut and then relayed to and approved by the United States, that United States employees inspected the work on the vessel, and that Kraljevic helped the United States negotiate the final bill with Coastal Marine. *See id.* Thus, the court in *LeBlanc*—consistent with the court in *Servis*—appropriately focused on direct operational control and consent by the United States, not by its agent, Connecticut. *See id.* at 714–15.

In the instant case, Plaintiff has tried to establish that Roberts acted as an agent of MTL. *See* Restatement (Third) Agency § 1.01 ("Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act."). However, Plaintiff—focusing on the relationship between Roberts and MTL—has failed to offer any evidence of a direct agency relationship between Roberts and the United States. Plaintiff presented no evidence that Roberts had any interaction or contact with the United States, through MARAD or otherwise—MARAD did not hire, pay, approve of, or supervise Roberts, and Roberts did not report to MARAD or deal with MARAD at all. The Court concludes that there was no direct agency relationship between Roberts and the United States.[35]

---

**35.** Because Plaintiff's arguments focus on the relationship between Roberts and MTL, as opposed to the relationship between Roberts and MARAD or the United States, the Court has also considered—in an abundance of caution even though not argued by Plaintiff—whether Roberts may be deemed a subagent of the United States.

Accordingly, the Court concludes that Roberts's conduct is not attributable to the United States. *Cf. Servis*, 54 F.3d at 207–09. Thus, addressing the merits of Plaintiff's claim, the Court will not impose liability (or a heightened duty) on Defendant for any conduct by Roberts.[36]

### D. Turnover Duties

The Court concludes that Defendant did not violate either the turnover duty or the turnover duty to warn. Plaintiff does not contend otherwise. Plaintiff's theory of this case would impose liability on Defendant for breach of a duty with respect to one of two alleged hazards within the starboard aft peak tank of the Cape Edmont— leaked gas and inadequate ventilation. Because these alleged hazards arose, if at all, after commencement of the repair operation, the turnover duties are inapplicable to the instant case. *See Howlett*, 512 U.S. at 98, 114 S.Ct. 2057 ("[T]he 'turnover duty[ ]' relates to the condition of the ship upon the commencement of [repair] operations."). Having heard no evidence or argument to the contrary, the Court concludes that Defendant turned over the Cape Edmont and its equipment to NFSI in a condition permitting NFSI to do its

---

"A subagent is a person appointed by an agent to perform functions that the agent has consented to perform on behalf of the agent's principal and for whose conduct the appointing agent is responsible to the principal." Restatement (Third) Agency § 3.15. If considered a subagent of the United States, Roberts's conduct would be attributable to the United States. *See id.* ("The relationship[ ] between ... the subagent and the appointing agent's principal [is a] relationship[ ] of agency...."). However, "[a]n agent may appoint a subagent only if the agent has actual or apparent authority to do so." *Id.* Thus, even assuming *arguendo* that Roberts was an agent of MTL, he may not be considered a subagent of the United States unless MTL had authority to appoint a subagent.

Because an entity such as MTL can act only through individuals, a *limited* authority to appoint subagents is implied, and "[w]hen an agent is itself a corporation or other legal person, its officers, employees, partners, or members who are designated to work on the principal's account are subagents." *Id.*, cmts. b-c. Accordingly, if Roberts was MTL's employee, he was a subagent of the United States. As previously discussed, however, Roberts was an independent contractor of MTL, not an employee. Therefore, he may be deemed a subagent of the United States only if MTL has some source of actual or apparent authority to so appoint him. *See id.* §§ 2.01, 2.03, 3.01, 3.03.

The creation of either actual or apparent authority requires some manifestation by the United States. *See id.* Plaintiff has introduced no evidence from which the Court could conclude that MTL had actual or apparent authority to appoint a subagent for the United States. *See id.* § 1.03 ("A person manifests assent or intention through written or spoken words or other conduct."). Indeed, as Plaintiff acknowledges, the ship manager's contract between the United States and MTL in this case was never introduced in evidence. *See* Plaintiff's Proposed Findings and Conclusions at 20. *Servis* is again instructive. There, the court determined that the contractors and subcontractors, retained by MTL, could not qualify as subagents of the United States because while "MTL could (and indeed had to) subcontract certain repair and maintenance duties, ... it was not authorized to delegate any of its management or operational responsibilities to a third party" and "[t]he [Ship Manager's] Agreement authorized MTL, and MTL alone, to manage and conduct the business of the" vessel. *Servis*, 54 F.3d at 208. Plaintiff produced no evidence that the United States authorized MTL to delegate its responsibilities or that it authorized Roberts to act on its behalf. In sum, the Court concludes that even if Roberts was an agent of MTL, he was not a subagent of the United States.

**36.** The Court notes that Plaintiff's theory of the case—and most of the evidence presented—focused on the conduct of Roberts. Although the Court has concluded that Defendant may not be held liable for any such conduct, the Court will nonetheless evaluate the remaining evidence to determine whether Plaintiff has established any other basis for liability.

work with reasonable safety and did not fail to warn NFSI of any hidden dangers of which it knew or should have known. *See Roach,* 857 F.2d at 1581: *see also Howlett,* 512 U.S. at 98–99, 114 S.Ct. 2057. Accordingly, Defendant has not violated the twin turnover duties. *See Roach,* 857 F.2d at 1581; *see also Howlett,* 512 U.S. at 98–99, 114 S.Ct. 2057.

## E. Level of Shipowner's Involvement

Because the alleged hazards in this case arose, if at all, after the commencement of repair operations, the Court must analyze the extent of Defendant's involvement in and control over the repair operations, locations, and equipment, to determine whether Defendant owed Plaintiff the narrow duty to intervene, or the broader active operations duty. *See Lampkin,* 823 F.2d at 1501–02; *see also Davis,* 16 F.3d at 540. To trigger the active operations duty, Defendant "must have substantially controlled or been in charge of (i) the area in which the hazard existed, (ii) the instrumentality which caused the injury, or (iii) the specific activities the [harbor contractor] undertook." *Davis,* 16 F.3d at 540 (citations omitted). The active operations duty does not require Defendant's exclusive control; concurrent control is sufficient to invoke the broader duty of care. *See Lampkin,* 823 F.2d at 1502.

■■■■■■ Not surprisingly, Defendant argues that it merely owed the limited duty to intervene (which it argues it did not breach), while Plaintiff argues that Defendant owed him the broader active operations duty (arguing that regardless of which duty applied, Defendant breached). However, the parties divergent arguments regarding the applicable duty flow from their differing views as to whether Roberts's conduct is attributable to the United States (and if so, whether his involvement in the steel renewal was sufficient to trigger the active operations duty). Plaintiff's argument for imposing the active operations duty is premised entirely on Roberts's conduct. As previously indicated, however, Roberts did not act as an agent of the United States, and his conduct is not attributable to Defendant. Discounting any conduct by Roberts, Plaintiff has shown no basis for imposing the active operations duty on Defendant. Neither chief engineer MacNeil nor any of the members of the Cape Edmont's crew were involved in the steel renewal project.[37] Moreover, their mere presence aboard the vessel, or periodic progress checks by government representatives, are insufficient to trigger the active operations duty. *See Fontenot,* 89 F.3d at 208 (quoting *Futo,* 742 F.2d at 210); *see also Gonzalez,* 588 F.Supp.2d at 761. Although NFSI used MTL's fire hoses and occasionally borrowed MTL's forklift, this equipment in no way malfunctioned or contributed to Plaintiff's accident.[38] There is no indication that any agent or employee of the United States exercised the requisite control to trigger the active operations duty. Accordingly, the Court concludes that the sole duty potentially applicable to Plaintiff's claim is the limited duty to intervene.

## F. Duty to Intervene

The duty to intervene is narrow—"the shipowner has a duty to intervene to protect the [harbor workers] only if 'it becomes aware that the ship or its gear poses a danger to the [harbor workers] and that the [harbor contractor] is failing,

---

**37.** Although one crew member entered the center steering gear area to check fire equipment, he did not enter the starboard or port aft peak tanks or participate in the steel renewal project.

**38.** Indeed, the fact that the fire hose functioned properly most likely saved Plaintiff's life.

unreasonably, to protect the [harbor workers]. . . .'" *Lampkin,* 823 F.2d at 1501 (quoting *Clark,* 784 F.2d at 1565); *see also Roach,* 857 F.2d at 1581 ("The shipowner must intervene only when it becomes aware that the ship, its equipment or gear poses a danger . . . *and* is also aware that the [harbor contractor] is acting unreasonably to protect the [harbor worker]."). Thus, "constructive knowledge" is insufficient; and Defendant may be held liable only if it had actual knowledge of a hazard and actual knowledge that NFSI was failing, unreasonably, to protect its workers. *See Roach,* 857 F.2d at 1581; *Lampkin,* 823 F.2d at 1501: *see also Casaceli v. Martech Int'l, Inc.,* 774 F.2d 1322, 1328 (5th Cir.1985) ("*Scindia* . . . requires the existence of two basic conditions for the imposition of the shipowner's duty to intervene—the shipowner's actual knowledge of a danger to a [harbor worker], and the shipowner's knowledge that the [harbor worker]'s employer is not acting reasonably to protect its employees from that danger.").

■ In the instant case, the Court concludes Plaintiff has failed to satisfy the basic conditions required for imposing a duty to intervene on Defendant. Although MTL and government representatives boarded the ship and occasionally even entered the starboard aft peak tank, there is no indication that they had actual knowledge of any hazards in the tank.[39] Indeed, the mere presence of a vessel's crew on the ship is insufficient to prove even constructive knowledge—let alone actual knowledge—of a hazard. *See Stockstill v. Gypsum Transp.,* 607 F.2d 1112, 1117 (5th Cir.1979)[40] ("Mere presence of the vessel's crew on the ship . . . does not prove knowledge of the hazardous condition."); *see also Marcell v. Sea–Land Serv., Inc.,* 883 F.2d 20, 22 (5th Cir.1989) ("[T]he mere presence of the vessel's crew on the ship does not prove even constructive knowledge of a hazardous condition.") (citations omitted).

The Court concludes that no employee or agent of the United States had actual knowledge of any hazard in the starboard aft peak tank. Indeed, the crew members' denials that they were advised of any such pre-accident hazardous conditions remained uncontroverted at trial. Because Plaintiff failed to produce any evidence of Defendant's actual knowledge of a hazardous condition—let alone actual knowledge of an unreasonable failure by NFSI to protect Plaintiff from such hazard—the Court concludes that Defendant did not violate a duty to intervene. *See Roach,* 857 F.2d at 1581: *Lampkin,* 823 F.2d at 1501; *Reardon Smith Lines, Ltd.,* 719 F.2d at 1111–12.

■ Moreover, even if the Court were to assume that Plaintiff had actual knowledge of a hazardous condition within the

---

**39.** Specifically with respect to ventilation, the Court notes that no MTL crew member was certified as either a marine chemist or competent person. As the Fifth Circuit Court of Appeals has recognized, "[t]here is a distinction between knowledge of a condition and knowledge of the dangerousness of that condition." *See Randolph v. Laeisz,* 896 F.2d 964, 971 (5th Cir.1990) (citing *Woods v. Sammisa Co., Ltd.,* 873 F.2d 842, 853 (5th Cir. 1989) *abrogated on other grounds by Kirksey v. Tonghai Maritime,* 535 F.3d 388, 396 (5th Cir.2008)); *see also Roach,* 857 F.2d at 1581 ("The shipowner must intervene only when it becomes aware that the ship, its equipment or gear *poses a danger* . . . .") (emphasis added). Plaintiff presented no evidence that any MTL representative or crew member would have appreciated the dangerousness of any ventilation condition he or she may have perceived other than a complete lack of ventilation.

**40.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc) the Eleventh Circuit adopted as binding precedent all the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

starboard aft peak tank of the Cape Edmont, Plaintiff's claim would nonetheless be barred by a more fundamental flaw. As the Fifth Circuit Court of Appeals has explained, a court should consider several factors in determining whether a shipowner incurred a duty to intervene, including:

whether the danger was open and obvious; whether the danger was located within the ship or ship's gear; which party created the danger or used the defective item and was therefore in a better position to correct it; which party owned and controlled the defective item; whether an affirmative act of negligence or acquiescence in the use of the dangerous item occurred; and whether the shipowner assumed any duty with regard to the dangerous item.

*Casaceli,* 774 F.2d at 1328 (citing *Futo,* 742 F.2d at 210).[41] Applying these factors, the Fifth Circuit has held that even assuming actual knowledge of a hazard, "absent some relevant assumption of duty by the shipowner," the duty to intervene does not "extend to an open and obvious transitory condition . . . that is created entirely by the independent contractor, is under its control, and relates wholly to its own gear and operations." *Futo,* 742 F.2d at 216–18; *see also Fontenot,* 89 F.3d at 209; *Casaceli,* 774 F.2d at 1327–28, 1331. Thus, for example, in *Hunter v. Intreprinderea de Explore Flott Maritime Navrom,* 868 F.2d 1386 (5th Cir.1989) (per curiam), the Fifth Circuit affirmed summary judgment that the shipowner violated no duty to intervene even where it assumed "[f]irst, . . . that the stevedore operation which injured [plaintiff] . . . was a dangerous practice"; "[s]econd, . . . that the vessel owner had actual and complete knowledge of these practices and their dangerous

character"; and "[t]hird, . . . that [the plaintiff] could not avoid the danger." *See id.* at 1387–88. The court held that the shipowner defendant was entitled to summary judgment because "the dangerous condition had nothing to do with the vessel's gear; . . . the vessel did not own the defective item; . . . there was no allegation of an affirmative act of negligence by the vessel; and . . . the shipowner had not assumed any duty with regard to the dangerous condition." *See id.* at 1388.

Although as a "new" Fifth Circuit opinion, *Futo* is not binding precedent in this Circuit, the Court notes that the *Futo* court arrived at its holding by addressing the continuing vitality of two pre-*Scindia* decisions of the former Fifth Circuit— *Brown v. Mitsubishi Shintaku Ginko,* 550 F.2d 331 (5th Cir.1977), and *Gay v. Ocean Transport & Trading, Ltd.,* 546 F.2d 1233 (5th Cir.1977). *See Futo,* 742 F.2d at 211–218. While recognizing that the standards articulated in *Brown* and *Gay* did not "remain entirely intact after *Scindia[.]*" the *Futo* court held that *Brown* and *Gay* nonetheless remained consistent with *Scindia* for the propositions relevant to that case, noting that to the extent of inconsistency, "*Scindia* narrowed the scope of liability allowed under [prior Fifth Circuit] cases." *See id.* at 216; *Casaceli,* 774 F.2d at 1327 (recognizing that "pre-*Scindia* cases in the Fifth Circuit concerning a vessel owner's duty to intervene" were based on "an analogy to the duties and exceptions to those duties of landowners toward employees of independent contractors under the Restatement (Second) of Torts, §§ 343, 343A" and that "*Scindia* reduced the scope of liability that those cases allowed, but did not negate the basic rationale underlying those decisions"); *see also Scindia,* 451

---

**41.** Although the Eleventh Circuit has not expressly adopted these factors, in *Roach,* the Eleventh Circuit cited *Casaceli* with approval and affirmed the district court, which relied on the *Casaceli* factors in granting summary judgment that the defendant violated no duty to intervene. *See Roach,* 857 F.2d at 1582.

U.S. at 168 n. 14, 101 S.Ct. 1614 (acknowledging that §§ 343 and 343A of the Restatement, while not providing "sure guidance" as to the duty to intervene, were also "not irrelevant"); *id.* at 180 & n. 1, 101 S.Ct. 1614 (Powell, J., concurring) ("[T]he Restatement standard adopted by the Second, Fourth, and Fifth Circuits ... is consistent with the plain intent of Congress to impose the primary responsibility on the stevedore. Although it is unnecessary in this case for the Court to adopt this standard fully, I do not understand our opinion to be inconsistent with it."). Because *Brown* and *Gay* remain binding precedent in this Circuit to the extent they have not been overruled or abrogated, *see Bonner,* 661 F.2d at 1209, this Court reads the *Futo* decision as an accurate discussion—albeit not binding—of the law in this Circuit.[42]

In the instant case, to the extent there existed any dangerous condition, lack of ventilation, or appropriate safety protocol to prevent gas leaks, such hazards were not born of the ship or its appurtenances. Rather, any hazardous conditions were created entirely by NFSI and its employees and did not relate to the Cape Edmont's gear or equipment. Moreover, any hazardous conditions (the leaking torch and pooled gas) were transitory, and actually known to Plaintiff. Accordingly, even if the Court were to assume that there was a hazardous lack of ventilation within the starboard aft peak tank and that Defendant had actual knowledge of that hazard or of the hazardous gas condition within

the starboard aft peak tank, such hazards would not give rise to a duty to intervene in this case. *See Futo,* 742 F.2d at 216–18; *see also Fontenot,* 89 F.3d at 209; *Intreprinderea,* 868 F.2d at 1387–88; *Casaceli,* 774 F.2d at 1327–28.

### III. Conclusion

In accordance with the foregoing and based on these findings of fact and conclusions of law, the undersigned concludes that Plaintiff has failed to prove by a preponderance of the evidence that Defendant is liable for the injuries he sustained in the January 26, 2006 accident aboard the Cape Edmont. The Clerk of the Court is hereby directed to enter judgment in favor of Defendant and against Plaintiff and Intervenors, and close the file.

**Jacqueline I. DEUEL, individually, Plaintiff,**

v.

**SANTANDER CONSUMER USA, INC., Defendant.**

**Case No. 09–CIV–82379–Cohn/Seltzer.**

United States District Court, S.D. Florida.

April 1, 2010.

---

42. The distinction between a hazard concerning a ship's gear or equipment and another hazard also finds some support in the language of several Eleventh Circuit opinions and *Scindia* itself. *See Scindia,* 451 U.S. at 175, 101 S.Ct. 1614 ("[W]e agree that there are circumstances in which the shipowner has a duty to act where the danger to longshoremen *arises from the malfunctioning of the ship's gear* being used in the cargo opera-

tions.") (emphasis added); *Lampkin,* 823 F.2d at 1501 ("[T]he shipowner has a duty to intervene ... only if 'it becomes aware *that the ship or its gear poses a danger ....*'" (quoting *Clark,* 784 F.2d at 1565) (emphasis added)); *Roach,* 857 F.2d at 1581 ("The shipowner must intervene only when it becomes aware *that the ship, its equipment or gear poses a danger ....*") (emphasis added).

Scott David Owens, Cohen & Owens PA, Hollywood, FL, for Plaintiff.

John B. Rosenquest, IV, Jones Walker, Miami, FL, for Defendant.

### ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS

JAMES I. COHN, District Judge.

**THIS CAUSE** is before the Court on Defendant Santander Consumer USA, Inc.'s Motion to Dismiss Count I of Plaintiff's Complaint [DE 13] ("Motion to Dismiss"). The Court has carefully reviewed the Motion to Dismiss, Plaintiff's response [DE 14], Defendant's reply [DE 16], and is otherwise fully advised in the premises.

### I. BACKGROUND

In 2009, Defendant Santander Consumer USA, Inc. called Plaintiff Jacqueline Deuel's cellular phone dozens of times in an attempt to collect a debt from someone named Amy Sagaert ("the Debt"). Complaint ¶ 9–11, 16. Defendant did not use the name "Santander Consumer USA, Inc." when calling Plaintiff. *Id.* ¶ 12. Rather, Defendant referred to itself as "Billing and Collections." *Id.* Plaintiff disclosed to Defendant in August 2009 that she was not Amy Sagaert and that the number Defendant called belonged to Plaintiff and not Amy Sagaert. *Id.* ¶ 13. Defendant, nevertheless, continued to attempt to collect the debt from Plaintiff. *Id.*

As a result, Plaintiff filed a complaint asserting three claims: 1) a violation of the

Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.* ("FDCPA"); 2) a violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq.*; and 3) a violation of the Florida Consumer Collection Practices Act, Fla. Stat. § 559.55 *et seq. See* DE 1. Defendant has since filed a Motion to Dismiss. The Motion to Dismiss seeks dismissal of only the FDCPA claim.

## II. DISCUSSION

### A. Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), a court shall grant a motion to dismiss where, based upon a dispositive issue of law, the factual allegations of the complaint cannot support the asserted cause of action. *Glover v. Liggett Group, Inc.,* 459 F.3d 1304, 1308 (11th Cir.2006). Indeed, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Thus, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Twombly,* 550 U.S. at 570, 127 S.Ct. 1955).

Nonetheless, a complaint must be liberally construed, assuming the facts alleged therein as true and drawing all reasonable inferences from those facts in the plaintiff's favor. *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955. A complaint should not be dismissed simply because the court is doubtful that the plaintiff will be able to prove all of the necessary factual allegations. *Id.* Accordingly, a well pleaded complaint will survive a motion to dismiss "'even if it appears that a recovery is very remote and unlikely.'" *Id.* at 556, 127 S.Ct. 1955.

### B. Defendant Santander Consumer USA, Inc.'s Motion to Dismiss

*1. The Complaint Adequately Alleges that Defendant Is a Debt Collector as that Term Is Defined within the FDCPA*

The FDCPA defines the term "debt collector" as follows:

[A]ny person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another. Notwithstanding the exclusion provided by clause (F) of the last sentence of this paragraph, the term includes any creditor who, in the process of collecting his own debts, uses any name other than his own which would indicate that a third person is collecting or attempting to collect such debts. For the purpose of section 1692f(6) of this title, such term also includes any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the enforcement of security interests.

15 U.S.C. § 1692a(6).

Here, the Complaint alleges that Defendant is "engaged in the practice of debt collection" and that "[a]t all times material to the allegations of the complaint, Defendant was acting as a debt collector with respect to the collection of Plaintiff's alleged debt." Complaint ¶¶ 4, 7. Moreover, Plaintiff alleges that "Defendant sought to collect an alleged consumer debt from 'Amy Sagaert' and called Plaintiff's cellular telephone dozens of time in an effort to collect said debt." *Id.* ¶ 11. Defendant, nonetheless, argues that Plaintiff "fails to allege facts supporting the allegation that [Defendant] is a 'debt col-

lector' within the purview of the Act." Motion to Dismiss at 2. The Court disagrees.

■ Plaintiff's allegations satisfy the notice pleading requirements set forth by the Federal Rules of Civil Procedure. Indeed,

> Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Specific facts are not necessary; the statement need only " 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.' "

*Erickson v. Pardus,* 551 U.S. 89, 93, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (citations omitted). Here, Plaintiff has certainly given the defendant fair notice of what the claim is and the grounds upon which it rests. Furthermore, the face of the Complaint does not allege any information to undermine the assertion that Defendant is a debt collector. *Cf. Reese v. JPMorgan Chase & Co.,* 686 F.Supp.2d 1291, 1307–09 (S.D.Fla.2009).

Notwithstanding, Defendant contends that it is not a "debt collector" because the term "debt collector" does not include

> any person while acting as a debt collector for another person, both of whom are related by common ownership or affiliated by corporate control, if the person acting as a debt collector does so only for persons to whom it is so related or affiliated and if the principal business of such person is not the collection of debts[.]

15 U.S.C. § 1692a(6)(B) ("the Affiliate Exception"). In other words, Defendant argues that Plaintiff has failed to plead that the Affiliate Exception is inapplicable.

■ Defendant is correct that the Complaint fails to allege that Defendant was not "acting as a debt collector for another person, both of whom are . . . affiliated by

corporate control." *See* Complaint; 15 U.S.C. § 1692a(6)(B). Likewise, the Complaint fails to allege that Defendant was not "acting as a debt collector . . . only for persons to whom it is so related or affiliated" or that "the principal business of [Defendant] is . . . the collection of debts." *See* Complaint; 15 U.S.C. § 1692a(6)(B). The Complaint, however, need not plead "the inapplicability of every exception to [the debt collector] definition." *Molloy v. Primus Auto. Fin. Servs.,* 247 B.R. 804, 821 (C.D.Cal.2000). Because the face of the Complaint does not indicate that Defendant clearly falls within an exception, like the Affiliate Exception, Plaintiff may be able to prove that Defendant is in fact a debt collector. Dismissal on that ground is therefore unwarranted. *See id.*

Defendant argues in its Motion to Dismiss that "[t]he creditor for this debt, which is referenced throughout the Complaint, is Sovereign Bank." Motion to Dismiss at 6. Defendant also argues in its Motion to Dismiss that "Sovereign Bank is an affiliate of [Defendant]." *Id.* These facts may be true, but they are not before the Court on the Motion to Dismiss. Indeed, the identity of the creditor for the Debt appears nowhere in the Complaint. Similarly, the name "Sovereign Bank" appears nowhere in the Complaint. Also, the nature of the Debt appears nowhere in the Complaint. Nevertheless, Defendant attached to its Motion to Dismiss "[a] true and correct copy of [the] Retail Installment Contract for the underlying debt, which the seller immediately assigned to Sovereign Bank." *Id.*

■ Defendant encourages the Court to consider a Retail Installment Sale Contract ("Contract") that purportedly evidences 1) the Debt and 2) that Defendant is not the creditor on the Debt.[1] Defendant

---

---

lector" as that term is defined within the FDCPA. *See* 15 U.S.C. § 1692a(6)(B). A motion to dismiss, however, is not the mechanism by which Defendant can make that showing.